Jeff CAMPBELL, M.D. and Physicians Primary Care Service, Appellants–Defendants,

v.

John SHELTON, Pam Shelton, and John Shelton, Sr., Appellees–Plaintiffs.

No. 10A04–9904–CV–171.

Court of Appeals of Indiana.

May 3, 2000.

Douglas B. Bates, Stites & Harbison, Jeffersonville, Indiana, Attorney for Appellants.

Derrick H. Wilson, Mattox & Mattox, New Albany, Indiana, Attorney for Appellees.

## OPINION

FRIEDLANDER, Judge

John and Pam Shelton and their son, John Shelton, Jr., filed a medical malpractice action against, among others, Jeff Campbell and Physicians Primary Care Service (PPCS). Following a trial, the jury found against Campbell and PPCS, and awarded damages to the Sheltons in the amount of $3,961,360.76. Campbell and PPCS appeal from that judgment, presenting the following restated issues for review:

1. Did the trial court commit reversible error in stating, in the jury's presence, that it would recognize one of the Sheltons' witnesses as an expert in his field?

2. Did the trial court err in allowing the Sheltons to introduce into evidence an excerpt from a medical dictionary?

We affirm.

The facts favorable to the judgment are that on September 19, 1992, Shelton, Jr. was playing in a high school football game. He was running with the ball when he was tackled out of bounds and struck his head on a concrete track that encircled the football field. He immediately saw stars. When he returned home after the game, he told his mother that he had a headache. For the next three days, Shelton, Jr. continued to complain of a headache and backache. After football practice on September 22, he told his coach that he had a headache. The coach informed Shelton, Jr. that he would not be permitted to play football again until a doctor had cleared him to play. Later that evening, John and Pam took Shelton, Jr. to the emergency room, where Shelton, Jr. informed hospital personnel about hitting his head on September 19 and his subsequent headaches and backaches. His vision was tested and was determined to be 20/25. Prior to that time, Shelton, Jr. had not worn glasses or contacts or complained about his vision. He was diagnosed with a closed head inju-

ry and did not attend school for the next two days.

On September 25, Shelton, Jr. was taken to the Humana Clinic in Clarksville, Indiana, where he was examined by Dr. Cheryl Adams. Dr. Adams administered another vision test. This time, Shelton, Jr.'s vision was determined to be 20/40. After the examination, Dr. Adams prescribed medication. She directed Shelton, Jr. to see Dr. Waterfill in a follow-up visit ten days hence. Dr. Waterfill placed a note in Shelton, Jr.'s chart to that effect. Finally, Dr. Adams informed Shelton, Jr. that he was not to play football for three weeks. Shelton, Jr. developed a fever and did not attend school again until September 29. When he returned, he did not participate in football or physical education classes.

On October 7, Pam took Shelton, Jr. back to the Humana Clinic, where he was examined by Campbell. Campbell did not consult with Dr. Waterfill, nor did he instruct the Sheltons to do so. During a four-minute examination, Campbell examined Shelton, Jr.'s throat or ears. He also asked whether Shelton, Jr. had a headache at that time. He then wrote on a prescription pad that Shelton, Jr. was cleared to resume playing football.

On October 10, Shelton, Jr. collapsed during a football game and lapsed into a coma. He was transported to the University of Louisville Hospital Emergency Room, where doctors determined that he should undergo surgery to remove a blood clot from his brain. The surgery revealed that Shelton, Jr. had a large acute subdural hematoma with an old, chronic component. The chronic component was the result of a previous injury from which Shelton, Jr. had not completely recovered. After surgery, Shelton, Jr. received inpatient treatment from October 10, 1992 through January 25, 1993. He attended an outpatient rehabilitation program from January 26, 1993 through March 29, 1993. Through the end of 1994, Shelton, Jr.'s medical expenses totaled $221,470.26. De-

spite the extensive treatment he received, Shelton, Jr. suffered permanent brain damage and will never be able to live independently or maintain gainful employment.

On May 11, 1994, the Sheltons filed a medical malpractice action against Campbell and PPCS, alleging that they breached the standard of care in rendering medical treatment for Shelton, Jr. The jury returned a verdict in favor of the Sheltons, as set out previously. Campbell and PPCS appeal that decision.

1.

The Sheltons presented several expert witnesses who testified regarding the applicable standard of care and Dr. Campbell's performance relative to that standard. The first such witness was Dr. Robert F. Sexton, a neurosurgeon. Campbell contends that the trial court committed reversible error in comments it made while admitting Dr. Sexton as an expert witness.

■ We conclude that Campbell waived any error in this regard. In *Fabian v. Goldstone*, 123 Ind.App. 49, 103 N.E.2d 920, 921 (1952), the trial court stated in the jury's presence:

> I am going to overrule the objection on the theory that the witness has stated his degree of knowledge which would make it appear as of some value, and let the jury determine what the testimony is worth; although I think that the better rule may be that this type of a witness should be a member of the profession in all respects at the time he gained the knowledge to which he testified.

The appellate court held that the appellant should have sought immediate relief by requesting that the remarks be stricken and the jury admonished. If the prejudice was so severe that such would not have cured the prejudice, then the appellant should have sought a mistrial. Noting that the appellant had done neither, and did not complain until after the trial was

concluded, the court held that the appellant waived the question and took her chances on a favorable verdict.

In the instant case, counsel did not immediately object to the court's comment, or take any other curative measure. Therefore, the issue was waived. *Id.* Even if it was not waived, however, Campbell is not entitled to reversal on this issue.

We begin by clarifying the issue under consideration. Campbell does not now nor did he at trial challenge Dr. Sexton's qualification as an expert witness. Likewise, he does not challenge the ultimate admissibility of Dr. Sexton's testimony. Rather, he contends that in commenting upon its decision to permit Dr. Sexton to offer expert testimony, the court vouched for Dr. Sexton's credibility.

It is important to consider the exchange upon which Campbell's claim of error is premised. At the outset of Dr. Sexton's testimony upon direct, the Sheltons sought to establish his credentials as an expert in the field of brain injuries. After presenting his curriculum vitae, the Sheltons offered a written summary of Dr. Sexton's credentials into evidence, at which time the following colloquy occurred:

> MR. FRANKLIN [SHELTONS' COUNSEL]: Okay sir. Yes sir. I'll put over here [sic]. Your Honor, I offer Dr. Robert Sexton as an expert in the filed of neurosurgery that he is licensed in and practices in.
>
> THE COURT: Mr. Schuster [Campbell's counsel]?
>
> MR. SCHUSTER: May I approach the bench, Your Honor?
>
> THE COURT: Yes sir.
>
> (BENCH CONFERENCE AMONG ALL ATTORNEYS AND JUDGE)
>
> MR. SCHUSTER: Unless there's a different rule in Indiana than there is in federal court, it's not required for the judge to pass his blessing upon the qualifications of a witness, and I object to you being asked to give him your blessing.
>
> MR. FRANKLIN: Well, I didn't want to get thrown out because I didn't make a procedural offering.
>
> THE COURT: Well, I'm not certain to be perfectly honest with you. I've seen it done, and I have seen it where they didn't ask me to qualify, and I'm not sure what the rule Mr. Rule Expert, what's the rule here?
>
> MR. WILSON: There is no rule. The seven hundred series is silent on this issue, your Honor, I think.
>
> THE COURT: I'll recognize him.
>
> **DIRECT EXAMINATION CONT'D**
>
> THE COURT: We'll recognize Dr. Sexton as an expert in his field.

*Record* at 1756–57.

With regard to the court's final comment, Campbell contends that it constituted error because: "Clearly, an endorsement by a trial court that a witness is an expert in his or her field places in a juror's mind the idea that the court considers the witness worthy and that the witness's testimony deserves added weight." Appellant's Brief at 11. In support of his argument, Campbell cites three Indiana cases and commentary to Rule 702 of the Indiana Rules of Evidence.

We first consider the cases cited by Campbell. They are cited to support the frankly uncontroversial proposition that it is within the factfinder's sole province to determine what weight should be assigned to an expert's testimony. One of the cases, *Prudential Ins. Co. of America v. Robbins,* 110 Ind.App. 172, 38 N.E.2d 274 (1941), is not factually similar to the instant case and is invoked only to support the boilerplate proposition set out above. Accordingly, we need not dwell upon it. The other two cases, however, involve situations in which a verdict was overturned upon appeal because the trial court impermissibly commented upon the credibility of witnesses.

In *Kintner v. State,* 45 Ind. 175 (1873), a suit was filed to establish paternity. One

witness testified that at about the time that the child in question would have been conceived, he observed the mother and alleged father engaging in sexual intercourse. While the plaintiff was cross-examining the witness, the court stated, within the jury's hearing: "You need not spend any further time with that witness." *Id.* at 177. The witness was then dismissed, after which the court stated: "I have serious doubts whether that witness ought not to be recognized to answer for perjury." *Id.* The appellate court concluded that the above remarks, combined with jury instructions that "strangely indicate[d] a leaning of the court against the defendant," *id.* at 178, constituted reversible error in that the trial court invaded the jury's province in assessing witness credibility.

In *Brunker v. Cummins,* 133 Ind. 443, 32 N.E. 732 (1892), a judgment was reversed because of certain remarks made by the judge in the jury's presence during trial. The nature of the error was explained as follows:

> The court, in ruling upon a question propounded to a witness, made this remark: "If this man, [meaning the appellant,] or anybody who received a rupture of the lung, and then subsequently received one that made it worse,-I don't see how the first could make it worse than the second, and the two together more than the one alone." This singular and confused statement of the court contains an erroneous expression of the law. If a man is suffering from an injury previously received, and that injury is aggravated by an accident caused by the negligence of a wrongdoer, the aggravation of the injury is sufficient to entitle the injured man to a recovery if other facts constituting a cause of action are established. The remark of the court was improper for the further reason that it expresses a decision upon a question of fact. In giving an expression upon

such a question the court wrongfully invaded the province of the jury.

*Id.,* 32 N.E. at 733.

We conclude that *Kintner* and *Brunker* offer little, if any, support for the proposition advanced by Campbell. In *Kintner,* the court openly disparaged a witness's credibility. Similarly, in *Brunker,* the court's comments left little room for doubt in the minds of the jurors that the court viewed the witness's testimony with skepticism. Neither even addresses, much less establishes, the boundaries with respect to court comments accompanying the qualification of a witness as an expert. We therefore proceed to a consideration of the remaining authority cited by Campbell, *i.e.,* committee commentary to Rule 702.

Rule 702 of the Indiana Rules of Evidence states:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Campbell correctly observes that if a jury believes that a court has somehow endorsed the credibility of a particular witness, then the jury's verdict will thereby be influenced. In order to prevent this from happening, according to Campbell, the committee charged with commenting upon Evid. R. 702 provided the following guidance: "The rule does not require a formal tender of the witness as an expert. The committee believes that judges normally should not announce their ruling that a witness is qualified as an expert, because the jurors may misinterpret such a ruling as an endorsement of the witness's testimony." Appellant's Brief at 10 (quoting Committee Commentary D Part (a) to Rule 702).

■ The Indiana Rules of Evidence were adopted by the Indiana Supreme Court on August 24, 1993, and became effective on January 1, 1994. The commentary to Rule 702, as set out above, may be found in *Burns Indiana Statutes Annotated* (Lexis 2000). A compiler's note accompanying the Rules of Evidence clarified, however, that our supreme court did not adopt the accompanying commentary to the rules:

> The Commentary is the product of the Committee on the Rules of Evidence, and was presented to the Supreme Court when the Committee presented its proposed Rules of Evidence.

> In its order adopting the Indiana Rules of Evidence, the Supreme Court provided, in part, "The Court has elected to adopt only the text of the Indiana Rules of Evidence. Practitioners may find the published committee proposal and its commentary helpful as history but should exercise care in its use, inasmuch as the Court has made changes from the committee proposal based on comments received from members of the bench and bar."

*Burns Indiana Statutes Ann., Court Rules*, vol. 1, page 512. Therefore, because the supreme court did not adopt the commentary, we decline to regard the views expressed therein as authoritative and binding on this court.

■ Having found Campbell's authority either unpersuasive or inapplicable, we now turn our attention to the argument that the trial court committed reversible error in commenting as it did when Dr. Sexton was offered as an expert witness. As we have observed, only the jury is permitted to determine the weight to be given a witness's testimony. *Nuerge v. State*, 677 N.E.2d 1043 (Ind.Ct.App.1997), *trans. denied*. Certainly, it is improper for a trial court to endorse a witness. *Kintner v. State ex rel. Ripperdan*, 45 Ind. 175. Nevertheless, we are not convinced that the jury would have understood the trial court's remarks to reflect its view

that Dr. Sexton was a witness whose testimony should be given special consideration. We note in this regard that the trial court later referred to several other witnesses, including some of Campbell's witnesses, as "experts." Moreover, Campbell's attorney referred to his own witnesses as experts, and also referred to Dr. Sexton as an expert witness. It therefore appears that, at trial, the term "expert" was applied by the court and the parties to several witnesses called by both sides, and was not applied only to Dr. Sexton. Viewed in this context, we believe that Campbell overstates the effect upon the jurors of the trial court comments in question.

■ We wish to clarify that we disapprove of the action undertaken by counsel here, *i.e.*, asking the trial court to expressly accept a witness as an expert. A court should refrain from making comments such as the trial court made in the instant case. We conclude, however, that the prejudicial effect of the erroneous comments in question was minimal, and does not warrant reversal.

### 2.

Campbell contends that the trial court erred in allowing the Sheltons to take judicial notice of definitions taken from a medical dictionary.

The Sheltons sought to admit the definitions under Evid. R. 201(a), which states:

> A court may take judicial notice of a fact. A judicially-noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

No Indiana case has addressed the question of whether a trial court may take judicial notice of a definition found in a medical dictionary.

Our examination of the case law of other states reveals one case in which a court has sanctioned the use of medical dictionaries for purposes of taking judicial notice of the meaning of a word. In *In re Compensation of Calder*, 157 Or.App. 224, 969 P.2d 1050 (1998), the court reviewed a determination by the Workers' Compensation Board that a claimant had a rateable scheduled disability of the right arm. Citing OEC 201(b)(2) and ORS 183.450(4), the court noted, "A court or administrative agency may take judicial notice of facts '[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *In re Calder*, 969 P.2d at 1051. The court then observed that "[a] dictionary may be such a source." *Id.* In fact, the court noted, the Oregon Court of Appeals and the Supreme Court "often [refer] to medical dictionaries to define medical terms." *Id.* The court held that the Workers' Compensation Board acted appropriately in consulting a medical dictionary.

Apart from the specific context of medical dictionaries, we note that, generally, Indiana courts have not been averse to taking judicial notice of the meanings of words. In *Journal–Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind.1999), our supreme court took judicial notice of the fact that the words "rats" and "rodents" are frequently used interchangeably. In *Wright v. Spinks*, 722 N.E.2d 1278 (Ind.Ct.App.2000), the appellee asked this court to take judicial notice of "mulligan" because its meaning could "be readily and easily determined by reference to sources that cannot be reasonably disputed." *Id.* at 1279. We noted that "mulligan" was defined in the dictionary. We also noted that the term was defined in three cases from other jurisdictions. We concluded, "[t]hese sources provide a basis for judicially noticing the meaning of mulligan as being a replacement golf shot." *Id.* at 1279–80.

In addition to these cases, there are numerous examples of our appellate courts referring to dictionaries in order to define words relevant to the resolution of an ap-

peal. These include cases involving consulting medical dictionaries for the meaning of medical terms. *See, e.g., Turner v. Davis*, 699 N.E.2d 1217 (Ind.Ct.App.1998) (regarding the definition of "sephalgia"), *trans. denied; Kohlman v. Indiana University*, 670 N.E.2d 42 (Ind.Ct.App.1996) ("quiescent"), *trans. denied; Kennedy v. Murphy*, 640 N.E.2d 764 (Ind.Ct.App.1994) ("ectopic pregnancy"), *aff'd in relevant part, vacated on other grounds*, 659 N.E.2d 506 (Ind.1995); *Indiana Comprehensive Health Ins. Ass'n v. Dye*, 531 N.E.2d 505 (Ind.Ct.App.1988) ("diagnosis"); *Gardner v. Review Bd. of Indiana Employment Sec. Div.*, 162 Ind.App. 125, 318 N.E.2d 361 (1974) ("dyscrasia").

■ We are mindful that there is a distinction between referring to a dictionary in a factfinding setting for the purpose of judicially noticing the meaning of a word, on one hand, and consulting such a source upon appellate review to discern the meaning of a term for purposes of, for example, statutory construction. We are also aware that several of the cases cited above do not involve judicial notice. Nevertheless, the preceding authority reflects that our courts generally regard dictionaries as "sources whose accuracy cannot reasonably be questioned." *See* Evid. R. 201(a). We conclude, therefore, that a court may take judicial notice of a dictionary definition of a word, so long as the other conditions set out in Evid. R. 201 are met.

■ The Sheltons contended that Campbell was negligent because he ignored symptoms that should have alerted him to the fact that blood had entered into Shelton, Jr.'s spinal canal. In support of this contention, the Sheltons were permitted to introduce into evidence Plaintiff's Exhibit 26, which contained the definitions of two medical terms associated with the symptoms that Campbell allegedly failed to discover or heed. Both definitions, which are reproduced below, were taken from *Dorland's Illustrated Medical Dictionary* 1011 (28th ed.1994):

**Meningism** (m –nin jiz-m): the symptoms and signs of meningeal irritation

associates with acute febrile illness or dehydration without acute infection of the meninges. Called also *meningismus* and *pseudomeningitis.*

**Pyrogen** (pr-ro-jin): a fever producing substance.

*Record* at 1871.

We note that Campbell does not contend that the definitions were erroneous or inaccurate. Rather, he challenges the trial court's decision to permit the introduction of Plaintiff's Exhibit 26 into evidence primarily upon the basis that it would confuse the jury because the definitions contained therein included other medical terms with which the jurors would be unfamiliar. According to Campbell, the language employed in the definitions was "very terse and mechanical," Appellant's Brief at 14, which may have "confused the jury into believing that the condition causes symptoms that are in reality never produced." *Id.* We note here that Campbell's argument with respect to the alleged confusion engendered by the technical language employed in the definitions pertains only to "meningism," because the definition of "pyrogen" does not contain technical terms.

First, we do not agree that the definition of "meningism" was, in view of all of the other medical testimony and evidence presented at trial, so technical as to be beyond the ken of the average, attentive juror. Second, we cannot subscribe to the proposition that providing the jury with accurate definitions—for indeed their accuracy was not challenged—necessarily increased the risk of the jury misunderstanding the medical issues involved in this case. Presumably, the opposite is true. We therefore conclude that, under the circumstances of this case, the trial court did not err in judicially noticing the *Dorland's Illustrated Medical Dictionary* definitions of the terms "meningism" and "pyrogen".

▪ Even if we were to conclude that the trial court erred in admitting Plaintiff's Exhibit 26, the error was harmless. An error in taking judicial notice is subject to a harmless error analysis. *See Woods v. State,* 654 N.E.2d 1153 (Ind.Ct. App.1995). Erroneously admitted evidence that is merely cumulative does not supply grounds for reversal. *Sledge v. State,* 677 N.E.2d 82 (Ind.Ct.App.1997).

In addition to the definitions contained in Plaintiff's Exhibit 26, the definitions of both terms were written on a chalkboard during trial, and were reiterated by Dr. Sexton during his testimony upon direct examination. Dr. Sexton explained: "Meningismis is the symptom complex that I talk about that's caused by a chemical irritant within the spinal fluid." *Record* at 1809. He defined "pyrogen" as "anything that causes a fever". *Id.* at 1810. In addition, other witnesses testified about meningism and pyrogens. Therefore, even if admission of the definitions in question by way of Plaintiff's Exhibit 26 was erroneous, the exhibit was merely cumulative of other, properly admitted evidence and the error was harmless.

▪ Finally, we need only briefly address Campbell's argument that the admissibility of Plaintiff's Exhibit 26 should be analyzed under Rule 803(18) of the Indiana Rules of Evidence, which governs the admissibility of learned treatises as an exception to the hearsay rule. As is the case with the erroneous admission of evidence under Evid. R. 201, an error in the admission of hearsay evidence does not require reversal if the erroneously admitted evidence was merely cumulative of other, properly admitted evidence. *Vehorn v. State,* 717 N.E.2d 869 (Ind.1999). Even assuming for the sake of argument that the admission of Plaintiff's Exhibit 26 was improper under Evid. R. 803(18), the exhibit was cumulative of properly admitted evidence and the error was harmless.

Judgment affirmed.

GARRARD, Sr.J. and DARDEN, J., concur.