**Charles Robert FARMER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 29A05–0810–CR–609.

Court of Appeals of Indiana.

July 9, 2009.

Steven Stoesz, Westfield, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Charles Robert Farmer ("Farmer") was convicted in Hamilton Superior Court of Class A felony attempted rape, Class A felony burglary, Class C felony robbery, Class D felony criminal confinement, and Class D felony criminal recklessness. Farmer also admitted to being a habitual offender. Farmer appeals and presents four issues, which we restate as:

I.   Whether the trial court erred in recognizing two of the State's witnesses as experts in front of the jury;

II.  Whether the trial court erred in permitting one of the State's expert witnesses to testify regarding an analysis performed by another individual;

III. Whether the trial court erred in excluding the self-serving portions of Farmer's statement to the police; and

IV.  Whether Farmer's convictions for burglary and robbery constitute double jeopardy.

We affirm.

### Facts and Procedural History

On November 25, 2007, Farmer was at a Wal–Mart in Noblesville, Indiana when he nearly collided with the victim in this case, L.N. Farmer later approached L.N. at the store and asked her a question about ingredients for a recipe. The following afternoon, Farmer came to L.N.'s house and rang the doorbell. L.N. was home with her young son, whom she had recently put to bed for a nap. L.N. answered the door and saw Farmer holding a small poinsettia plant. Farmer said he was there for a "floral delivery." Tr. p. 354. L.N. was suspicious because the plant was not wrapped and had no gift card with it and because Farmer said he assumed the plant was a gift from L.N.'s husband, who was at work at the time. When Farmer went to his vehicle, allegedly to get paperwork so L.N. could sign for the plant, L.N. noticed that Farmer went to a silver Ford Explorer. Farmer returned with a sheet of paper and asked if L.N. had a pen. When L.N. returned to the door from retrieving a pen, Farmer pushed the door open and lunged at L.N., knocking her down.

L.N. struggled with Farmer as he placed his hand over her nose and mouth, causing her to become weak. Farmer shut the door and told L.N. to sit in a chair in the living room. Farmer told L.N. that he was there for "money" and would not hurt her. Tr. p. 367. Farmer used duct tape to bind L.N.'s wrists and ankles and threatened her with a box-cutting knife, which Farmer said "he would use ... if he had to." Tr. p. 372. L.N. told Farmer where to find her bank cards and told him the pin numbers. Over the next two hours, Farmer moved L.N. from room to room while demanding cash and jewelry. When L.N. told Farmer how much money was in her bank accounts, Farmer forced her to show him her bank account balances on her computer. Farmer also reminded L.N. that he had seen her the day before at Wal–Mart and told her that he had been stalking her for two or three weeks. He also told L.N. that he knew who her husband was, and repeatedly threatened to kill her, her husband, and her son.

After inquiring into L.N.'s sexual habits with her husband, Farmer told L.N. that she was "sexy" and stated, "I'm gonna f* * * you," because he had not gotten as much money as he wanted. Tr. pp. 403–04. He then made L.N. bend over a chair in the living room and pulled up her sweater and bra and pulled down her jeans and underpants. Farmer touched L.N.'s breasts and rubbed his penis against her

buttocks and vagina. Farmer, however, did not have an erection and told L.N., "No, I'm not gonna do it." Tr. p. 410.

Shortly thereafter, L.N.'s son woke up from his nap and began to call for his mother. Farmer made L.N. lie on the floor and began to ask her for more money. L.N. offered Farmer jewelry. At first, Farmer replied that it was difficult to "get rid of jewelry," and later threatened to "take [L.N.] with [him]." Tr. pp. 367, 415. At this, L.N. began to cry. Farmer then went to look for more duct tape, and told L.N. that he was going to take her to the master bedroom, tape her up, and leave. As he went to the garage to look for the tape, he warned L.N., "Don't try anything, I'll kill you, or I'll hurt you, your son, your husband." Tr. p. 417.

After getting more duct tape, Farmer told L.N. to go upstairs to the master bedroom. In the bedroom, Farmer made L.N. go through her jewelry while he picked out what he considered the more valuable pieces, including a diamond necklace, diamond earrings, a pearl necklace, and pearl earrings. Farmer then ordered L.N. to get on the bed and tied her to the bedposts with a telephone cord and a cord he had ripped from a baby monitor. He also wrapped duct tape around the cords. While Farmer was tying L.N. to the bed, her son left his room and began to play with toys while repeatedly calling for his mother.

At one point, Farmer asked L.N. if she had seen his car. When L.N. feigned ignorance, Farmer told her he was driving a silver Buick, which he claimed he had stolen. Farmer, who is white, also told L.N. to tell the police that a black man driving a silver Buick had committed the crimes. He also told L.N., "if he saw a physical description of himself on the news ... 'I will kill your husband, I will have you kill your son[,] and then I will take you with

me somewhere and let men have their way with you[,] and then I'll kill you.' " Tr. p. 439.

After Farmer had tied L.N. to the bed, her son came to the bedroom door and tried to get in. Farmer told L.N. that he would hide behind the door, let her son in, and leave. However, when L.N.'s son entered the room, he saw Farmer enter the bathroom and close the door. L.N.'s son tried to get in the bed with his mother. Farmer then came out of the bathroom and helped L.N.'s son onto the bed. Farmer accused L.N. of trying to escape, and re-taped her arms and legs and also wrapped duct tape around her mouth and head. Farmer then threatened L.N. by thrusting his knife toward her stomach as if to stab her. Farmer then laughed and said, "Nah, I'm not gonna do it, I just wanted to scare you." Tr. p. 452. Farmer warned L.N. that he might return, and reminded her to tell the police that a black man driving a silver Buick had committed the crimes. Farmer left, but returned a few minutes later and asked about her neighbor's car and how to use her garage door opener. He also spoke to L.N.'s son and commented that L.N. looked "sexy" in a vacation photograph. Tr. p. 455. Farmer then left again, calling to L.N., "Remember [L.N.], what color am I? What car do I drive?" Tr. p. 456.

Too frightened to move, L.N. lay on the bed for approximately an hour and a half before she was able to loosen her hands and legs. She then grabbed a handgun that had been in a nightstand, ordered her son to stay in the bedroom, and went downstairs. L.N. found her mobile phone and called her husband, telling him, "Get home now. We['ve] been robbed. I['ve] been tied up. There is an intruder in the house." Tr. p. 465. She then returned to the bedroom with her son and dialed 911. Heeding Farmer's warning, L.N. initially

told both her husband and the 911 operator that her attacker was a black male. However, when the police arrived at her house, she told them that Farmer was a white male. L.N. worked with a police sketch artist, who drew a picture of Farmer. The police took L.N. to the hospital, where a rape kit was performed and her injuries photographed. The police also photographed L.N.'s house and took fingerprints. As a result of the attack, L.N. suffered from numerous cuts, scrapes, and bruises.

After leaving L.N.'s house, Farmer used one of L.N.'s debit cards to buy gasoline and to withdraw cash from an ATM at a nearby bank. He also used another bank card to withdraw more cash. Farmer then went to Clarksville, Indiana, where his parents lived, and attempted to use L.N.'s card for an online purchase. The police tracked this attempted purchase and obtained the IP address Farmer used. This IP address led the police to the home of Farmer's parents. After executing a search warrant at this house, the police found information leading to an address in Noblesville, where Farmer lived with a roommate.

The police then executed a warrant at this address and discovered duct tape with L.N.'s hair and red fibers which were similar to those from the sweater L.N. had been wearing. The police also discovered a receipt showing that Farmer had purchased a poinsettia plant. Other evidence found included two ATM receipts showing that Farmer had used L.N.'s bank cards to withdraw cash, and a receipt from Wal–Mart from the day that Farmer had first approached L.N. L.N. later identified Farmer as her attacker from a photographic line-up. The police then obtained a warrant for Farmer's arrest.

Before he was apprehended by the police, Farmer admitted to a friend that he was wanted for burglary. He further admitted to this friend that he had gone to L.N.'s home with a poinsettia, acted as a deliveryman, forced his way inside, taped up L.N. and stole items from her. He later admitted to his friend that he had taken jewelry from L.N.'s home and that he had met L.N. at Wal–Mart.

United States Marshalls eventually found Farmer in Salt Lake City, Utah by tracking his mobile telephone use. In Utah, Farmer was taken into custody and interviewed by Detective Montgomery ("Montgomery") of the Taylorsville, Utah police department. During a four and one-half hour interview, Farmer admitted to Montgomery that he was wanted for burglary and admitted to driving a Ford Explorer. Farmer initially denied any involvement in the attack on L.N. But Farmer eventually admitted that he had encountered L.N. at Wal–Mart and that he had gone to her home on the afternoon of November 26. He also admitted to pawning L.N.'s jewelry at a pawnshop in Texas. He further admitted that he had purchased a poinsettia plant and indicated that he knew where L.N. lived without having to follow her. He then admitted that he had struggled with L.N., bound her to the bed, and took her bank cards and jewelry. He stated that he had withdrawn $700 from L.N.'s accounts and threw one of the cards away. When asked about the sexual assault, Farmer denied it. He did, however, state that his encounter with L.N. "got ugly." Tr. pp. 861–62.

A search of Farmer's car in Utah revealed L.N.'s pearl earrings and necklace, a box cutting knife, and a laptop computer. L.N.'s diamond earrings and necklace were later recovered from a Texas pawnshop. A search of Farmer's Ford Explorer in Clarksville revealed another knife, duct tape, and a receipt from the Texas pawnshop.

On December 11, 2007, the State charged Farmer with Class A felony attempted rape, Class B felony robbery, Class B felony burglary, Class B felony criminal confinement, Class D felony criminal recklessness, and Class D felony theft. The State later amended the burglary charge to allege a Class A felony and to add an allegation that Farmer was a habitual offender. A jury trial was held on June 16 through 21, 2008. At trial, the State tendered two forensic witnesses as "experts," and the trial court referred to both witnesses as "experts" in the presence of the jury.

One of these witnesses, Indiana State Police Laboratory manager Scott Owens ("Owens"), testified that he was a forensic scientist with the "microanalysis or trace evidence unit." Tr. pp. 679–80. Owens testified that his fellow forensic scientist, Kathy Boone ("Boone"), actually completed the analysis of the evidence, but that he had reviewed all of the information and her findings prior to testifying and found her conclusions to be accurate. Owens testified that the red fibers found on the duct tape recovered from Farmer's garage were similar to those from the sweater L.N. had been wearing at the time of the attack. Farmer did not initially object to Owens's testimony, but eventually objected to Owens testifying about Boone's findings, claiming an insufficient foundation for Owens's expert opinion. The trial court overruled Farmer's objection. The second expert witness, Indiana State Police DNA analyst Shawn Tucker ("Tucker") testified that the hair found on the duct tape recovered from Farmer's garage was L.N.'s hair.

Detective Montgomery testified regarding Farmer's statements to her during his interview in Utah. The State filed a motion in limine seeking to prevent Farmer from introducing any self-serving statements from the interview with Montgomery. The trial court granted the State's motion with regard to Farmer's self-serving statements, but denied it with regard to his general denials. Farmer also testified on his own behalf, claiming that he had met L.N.'s husband at a bar and that L.N.'s husband had asked him to stage a burglary at his house for the insurance money. Farmer claimed that L.N. was cooperative when he entered her home, took her jewelry and bank cards, and tied her to the bed. Farmer tried to explain away his statements to Montgomery, but admitted that he never told her about any insurance scam with L.N.'s husband. He further admitted that neither L.N. nor her husband had received any financial benefit from this supposed scam.

At the conclusion of the trial, the jury found Farmer guilty of Class A felony attempted rape, Class A felony burglary, Class B felony robbery, Class B felony criminal confinement, Class D felony criminal recklessness, and Class D felony theft. Farmer then admitted to being a habitual offender. At a sentencing hearing held on July 17, 2008, the trial court vacated Farmer's conviction for Class B felony robbery on double jeopardy grounds and instead entered a judgment of conviction for Class C felony robbery. Similarly, the trial court vacated Farmer's conviction for Class B felony criminal confinement and entered a judgment of conviction for Class D felony criminal confinement. The trial court also vacated Farmer's conviction for Class D felony theft. The trial court entered judgments of conviction on the remaining jury verdicts and proceeded to sentence Farmer as follows: fifty years for Class A felony attempted rape, enhanced by thirty years due to the habitual offender determination; fifty years for Class A felony burglary; eight years for Class C felony robbery; two years for Class D felony criminal confinement; and two

years for Class D felony criminal reckless-ness. The trial court ordered all the sen-tences to be served consecutively, for an aggregate term of 142 years. Farmer now appeals.

## I. Tender of Expert Witnesses

█ Farmer first claims that the trial court erred by referring to two of the State's witnesses as "experts" in the pres-ence of the jury. Specifically, with regard to witness Scott Owens, the State asked initial questions regarding Owens's qualifi-cations, then said to the trial court, "Your Honor, I have tendered this witness as an expert in the area of trace evidence analy-sis." Tr. p. 681. The trial court asked Farmer's counsel for a response, to which he stated:

> Your Honor, I don't believe that it is appropriate to tender a witness ... as an expert. I think it is more appropri-ate to elicit opinion testimony and whether the foundation has met relative to that opinion elicited, is the basis for the objection. So, I don't think courts recognize witnesses as experts until opinions are elicited.

*Id.* After a response by the State, the trial court ultimately concluded, "This witness would be found to be of such a nature that he would render an opinion which if that makes him an expert in this area, then he would be an expert in this area." *Id.* Similarly, when the State tendered Shawn Tucker as an "expert," the trial court stat-ed, "I'll determine he is an expert at this point." Tr. p. 776.

In support of his argument, Farmer cites *Campbell v. Shelton,* 727 N.E.2d 495 (Ind.Ct.App.2000), *trans. denied.* In that case, the plaintiff stated to the trial court, "Your Honor, I offer Dr. Robert Sexton as an expert in the field of neurosurgery that he is licensed in and practices in." *Id.* at 498. After a bench conference, the trial court stated, "We'll recognize Dr. Sexton as an expert in his field." *Id.* On appeal, the court explained that only the jury is permitted to determine the weight to be given a witness's testimony and that it is improper for a trial court to endorse a witness.[1] *Id.* at 500. Thus, neither coun-sel nor the trial court should refer to wit-nesses as "experts" in the presence of the jury. *Id.* The *Campbell* court concluded that reversal was not warranted, however, because the jury in that case would not have understood the trial court's remarks to have been an endorsement. *Id.* The court specifically noted that the trial court had referred to other witnesses as "ex-perts," including some of Campbell's wit-nesses, and Campbell's own attorney had referred to his own witnesses, and the witness at issue on appeal, as "expert" witnesses. "Viewed in this context," the court concluded, "we believe Campbell overstates the effect upon the jurors of the trial court comments in question." *Id.* at 500.

In the present case, we first note that Farmer's response to the State's tender of Owens as an expert was not based on the same grounds he now argues on appeal. Although Farmer argued that it was not "appropriate to tender a witness ... as an expert," he later explained, "I don't think courts recognize witnesses as experts *until opinions are elicited.*" Tr. p. 681 (empha-sis added). Thus, Farmer did not neces-

---

1. The *Campbell* court first held that the appel-lant had waived the issue because his trial counsel did not immediately object to the court's statement or take any other curative measures. *Id.* at 498. The court nevertheless proceeded to address Campbell's claim on the merits, notwithstanding the waiver. *Id.* Thus, the court's discussion of the propriety of the trial court's referring to the witness as an "expert" in front of the jury is, strictly speak-ing, *dicta.*

sarily take issue with the trial court recognizing Owens as an expert, but complained only about when such recognition took place. Farmer's response to the State's tender of Tucker as an expert was, "Same response as previous tender." Tr. p. 775. Further, there is no indication that Farmer "t[ook] any other curative measure." *See Campbell,* 727 N.E.2d at 498. We therefore conclude, as did the court in *Campbell,* that Farmer has failed to preserve this issue for purposes of appeal. *Id.*

Waiver notwithstanding, Farmer would still not prevail. Farmer does not claim that Owens and Tucker were not experts; he claims only that the trial court should not have referred to them as such in front of the jury. However, the trial court instructed the jury regarding expert witnesses as follows:

> You should judge the testimony of the expert witness in the same manner as you judge the testimony of any other witness. In deciding its weight, you may also take into consideration the expert's skill, experience, knowledge, veracity, familiarity with the facts of this case, and the general rules for deciding the credibility of witnesses.

Appellant's App. p. 182 (emphasis added). The jury was further instructed that they were "the exclusive judges of the evidence, which may be either witness testimony or exhibits." *Id.* at 178. Thus, after the jury heard the judge referred to the witnesses as experts, they were instructed that they were the exclusive judges of all witness testimony, including experts. Although the trial court should not have referred to the witnesses as experts in the presence of the jury, under these facts and circumstances, we cannot conclude that the trial court's statements constitute reversible error. *See Campbell,* 727 N.E.2d at 500.

## II. Expert Witness Testimony

■■■ Farmer also claims that the trial court erred in permitting witness Scott Owens to testify regarding an analysis performed by another laboratory analyst, Kathy Boone. In addressing this claim, we note our standard of review:

> The admission of evidence is within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law.

*Rogers v. State,* 897 N.E.2d 955, 959 (Ind. Ct.App.2008), *trans. denied.*

The State correctly notes that Owens testified at length regarding Boone's analysis before Farmer conducted a voir dire of Owens regarding whether he had personally performed the analysis. Even then, Farmer did not object until the State asked Owens whether, in his opinion, Boone's analysis was correct. Thus, much of Owens's testimony came in without objection.

■■ More importantly, even if we were to agree with Farmer that the trial court erred in admitting Owens's testimony, any error would be harmless. Errors in the admission of evidence are to be disregarded as harmless unless they affect the defendant's substantial rights. *Rogers,* 897 N.E.2d at 961 (citing Ind. Trial Rule 61; Ind. Evidence Rule 103(a)). An error will be deemed harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Id.*

Here, Owens testified that the duct tape found in Farmer's garage and the fibers on this tape were "similar" to the duct

tape found in L.N.'s home and the fibers of the sweater she was wearing during the attack. Although this evidence does link Farmer with the crimes, we agree with the State that it pales in comparison to the other evidence of Farmer's guilt, which included L.N.'s identification of Farmer as her assailant, Farmer's confession to his friend, and Farmer's statements to the police in Utah. Further, the police found in Farmer's vehicles L.N.'s pearl jewelry, a box-cutting knife, and a receipt from the pawnshop where L.N.'s jewelry had been pawned. At Farmer's residence in Noblesville, police found receipts showing the use of L.N.'s bank cards and a receipt for a poinsettia plant. In light of this overwhelming evidence of Farmer's guilt, we conclude that any error with regard to Owens's testimony was harmless. *See Rogers*, 897 N.E.2d at 961 (any error in admission of evidence regarding defendant's prior possession of a knife was harmless in light of testimony of three eyewitnesses who saw defendant fatally stab victim).

### III. Exclusion of Farmer's Statements

■ Farmer next complains that the trial court erred when it excluded portions of the statement he gave to the police in Utah. At trial, Detective Montgomery testified that Farmer admitted to being at L.N.'s home, that he and L.N. got into a struggle when he entered her house, that he taped L.N.'s hands and feet, and that he took her bank cards and jewelry. However, the trial court granted the State's motion in limine preventing Farmer from admitting into evidence any of the self-serving statements made by Farmer during the interrogation. Specifically, Farmer now claims that his trial counsel should have been allowed to question Montgomery regarding whether Farmer denied sexually assaulting L.N, regarding Farmer's statements about the nature of the struggle between him and L.N., and regarding

whether Farmer said anything about using a weapon.

To support his argument, Farmer relies on Indiana Evidence Rule 106, which provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with it." As noted in *Lewis v. State*, 754 N.E.2d 603, 607 (Ind.Ct.App.2001), Evidence Rule 106 applies only to "a writing or recorded statement or part thereof...." Here, the State did not introduce a writing or recording of Farmer's statement to Montgomery, but instead simply relied on Montgomery's testimony to relay Farmer's statements. As such, Evidence Rule 106 is inapplicable. *See id.* Still, the common-law "doctrine of completeness" applies not only to writings but oral conversations too. *Id.* "Therefore, it will always be proper to cross-examine and to impeach an officer testifying about a conversation with a defendant." *Id.* (citing *McElroy v. State*, 553 N.E.2d 835, 839 (Ind.1990)). The doctrine of completeness applies even to self-serving hearsay statements. *McElroy*, 553 N.E.2d at 839.

■ Thus, it appears that the trial court should have permitted Farmer to elicit from Montgomery the self-serving portions of Farmer's statement to the police. We nevertheless cannot conclude that reversal of Farmer's convictions is required. Although both parties appeared to use a transcript of Farmer's statements while questioning Montgomery, neither party offered this transcript into evidence. Moreover, Farmer did not make an offer of proof with regard to the evidence he now claims was improperly excluded. Generally, error may not be predicated upon a

ruling which excludes evidence unless the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which questions were asked. Ind. Evidence Rule 103(2). In order to preserve the exclusion of evidence for appellate review, a defendant must make an offer of proof, setting forth the grounds for admission of the evidence and the relevance of the testimony. *Warr v. State,* 877 N.E.2d 817, 822 (Ind.Ct.App.2007), *trans. denied.* By failing to make an offer of proof, Farmer failed to preserve any error with regard to the excluded testimony. *See id.*

■ Even if Farmer had properly preserved this issue, he would not prevail. In *McElroy,* a police officer testified regarding incriminating statements the defendant had made, but the trial court prevented the defendant from cross-examining the officer with regard to the remainder of the defendant's statements, concluding that such were self-serving. 553 N.E.2d at 839. On appeal, the *McElroy* court held that even self-serving statements were admissible under the doctrine of completeness and that the trial court had therefore erred in preventing the defendant from cross-examining the officer with regard to these self-serving statements. *Id.* at 839–40. The court nevertheless held:

> such error does not require reversal because of appellant's ability to recite his recollection of the interrogation during his direct examination. The record in this case discloses that appellant testified in his own behalf at great length. When a defendant is testifying in person, he is free to tell his version of the entire matter as he sees fit.

*Id.*

The same is true here. Farmer testified at length on his own behalf and explained his statement to Montgomery. Farmer further claimed that L.N.'s husband had asked him to stage a burglary at his house. Under these facts and circumstances, we cannot say that Farmer has demonstrated reversible error. *Id.* at 840.

Farmer also claims that the exclusion of his self-serving statements to Montgomery effectively forced him to give up his right against self-incrimination and testify at trial. However, Farmer did not testify solely to explain his statements to Montgomery. He also testified regarding his defense that L.N.'s husband asked him to stage a burglary for insurance reasons. Also, we cannot ignore the other substantial evidence of Farmer's guilt, particularly L.N.'s identification of Farmer as her attacker, Farmer's admission to his friend, and the discovery of L.N.'s property in Farmer's vehicles and residence. For the foregoing reasons, we conclude that the trial court's limitation of Farmer's cross-examination of Montgomery was harmless error.

### IV. Double Jeopardy

■ Lastly, Farmer claims that his convictions for burglary and robbery subjected him to double jeopardy. The jury found Farmer guilty of Class A felony burglary and Class B felony robbery. At sentencing, the trial court entered a judgment of conviction for Class C felony robbery because the same deadly weapon was used to enhance both crimes. Farmer claims that the trial court should have completely vacated his robbery conviction and entered a judgment of conviction only for Class A felony burglary.

Article 1, Section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." In *Richardson v. State,* 717 N.E.2d 32, 49 (Ind.1999), our supreme court developed a two-part test for Indiana double jeopardy claims, holding that two or more offenses are the "same offense" in violation of Article 1, Section 14 if, with respect to either

the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

Here, Farmer claims that his convictions constitute double jeopardy under the "actual elements" test. Our supreme court recently summarized the actual evidence test as follows:

> Under this inquiry, the actual evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense.

*Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008) (quoting *Richardson*, 717 N.E.2d at 53). The court further explained that:

> The test is not merely whether the evidentiary facts used to establish one of the essential elements of one offense may also have been used to establish one of the essential elements of a second challenged offense. In other words, under the *Richardson* actual evidence test, the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense.

*Id.* (quoting *Spivey v. State*, 761 N.E.2d 831, 833 (Ind.2002)). "Application of this test requires the court to 'identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective[.]'" *Id.* (quoting *Spivey*, 761 N.E.2d at 832).

Here, to convict Farmer of Class A felony burglary, the State had to establish that Farmer: (1) broke and entered L.N.'s home, (2) with the intent to commit the felony of robbery therein, (3) resulting in bodily injury to L.N. *See* Ind.Code § 35–43–2–1(2)(A) (2004); *Lee*, 892 N.E.2d at 1234; Appellant's App. p. 22. To convict Farmer of Class C felony robbery, the State was required to prove that he: (1) knowingly or intentionally, (2) took property from L.N. or from the presence of L.N., (3) either by (a) using or threatening the use of force, or (b) putting L.N. in fear. *See* Ind.Code § 35–42–5–1 (2004); *Lee*, 892 N.E.2d at 1234; Appellant's App. p. 230.

Farmer claims, "The stealing, or taking of [L.N.]'s property was the essential element of both crimes." Appellant's Br. p. 20. We disagree. The evidence demonstrating Farmer's intent to commit robbery was separate and distinct from his actual act of robbing L.N. Soon after he forced his way into her house, Farmer told L.N., "I want money." Tr. p. 367. This clearly demonstrates his intent to commit robbery at the time he broke and entered. *See Lee*, 892 N.E.2d at 1235 (defendant's act of demanding money after he broke and entered victim's home proved that defendant intended to commit a felony in the home). After this, Farmer, while armed with a box-cutting knife, taped L.N.'s hands and feet, took her from room to room, and demanded and took her property. This evidence supports his robbery conviction. *See id.* As such, there is no reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of Class A felony burglary may also have been used to establish the essential elements of a Class C felony robbery. *See id.* (defendant's convictions for burglary and attempted armed robbery did not constitute double jeopardy).

## Conclusion

Farmer has not established reversible error in the trial court's reference to two of the State's witnesses as experts in the presence of the jury or in permitting one of the witnesses to testify with regard to the tests performed by another analyst. Similarly, Farmer has not established reversible error in the trial court's exclusion of the self-serving statements Farmer made during his police interrogation. Lastly, Farmer's convictions for burglary and robbery do not constitute double jeopardy under the actual evidence test.

Affirmed.

RILEY, J., concurs.

KIRSCH, concurs in result.