**Noe ROMO, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–1003–CR–143.**

Court of Appeals of Indiana.

June 23, 2010.

---

Jeffrey A. Baldwin, Baldwin Dakich & Maxwell, Indianapolis, IN, Attorney for Appellant.

**OPINION**

DARDEN, Judge.

*STATEMENT OF THE CASE*

Noe Romo appeals his convictions for three counts of class A felony dealing in cocaine.[1]

We affirm.

*ISSUES*

1. Whether the trial court erred in admitting transcripts of the taped drug transactions.

2. Whether the State failed to establish a proper foundation for the transcripts.

3. Whether the trial court improperly permitted a witness to give opinion testimony without a proper foundation.

*FACTS*[2]

Confidential informant, S.S., entered into an agreement with Indianapolis Metropolitan Police Department ("IMPD") to assist law enforcement by conducting covert narcotics transactions with Romo. On each occasion, police conducted video surveillance of the narcotics transactions, and S.S. wore police-issued audio recording equipment. On May 10, 2007, S.S., Romo, and their mutual friend, Nancy, met at a pre-arranged location, where Romo sold approximately one ounce of cocaine to S.S. for $1,000.00. On May 16, 2007, Romo sold approximately two ounces of cocaine to S.S. for $2,000.00. On August 6, 2007,

---

1. Ind.Code § 35–48–4–1.

2. The State has not filed an appellee's brief; thus, the appellant may prevail by making a *prima facie* showing of error. *Sims v. State,* 771 N.E.2d 734, 743 (Ind.Ct.App.2002). In this context, *prima facie* is defined as "at first sight, on first appearance, or on the face of it." *State v. Augustine,* 851 N.E.2d 1022, 1025 (Ind.Ct.App.2006). "However, this circumstance in no way relieves us of our obligation to decide the law as applied to the facts in the record in order to determine whether reversal is required." *Sims,* 771 N.E.2d at 743.

Romo sold approximately one ounce of cocaine to S.S. for $1,000.00.

On January 23, 2008, the State charged Romo with three counts of class A felony dealing in cocaine, and he was tried before a jury on October 21, 2009. In advance of trial, Romo and counsel were provided with the audio-taped conversations between Romo and S.S., as well as transcripts thereof. At the trial, IMPD Detective Jesus Soria testified to the following: (1) that Romo and S.S. spoke Spanish during the covert buys; (2) that Soria understands and speaks Spanish fluently; (3) that Soria was in the police vehicle translating S.S. and Romo's conversations for a federal drug agent involved in the case; (4) that IMPD interpreter Elia James, who also understands and speaks Spanish fluently, transcribed the recordings; (5) that Soria "read through [the transcripts] . . . while listening to the audio," (tr. 254); (6) that Soria, James, S.S., and Marion County Prosecutor's Office translator Azaldo DeFord were involved in the preparation of the transcripts; (7) that they compared the transcribed conversations with the audio recordings and made agreed-upon corrections thereto; and (8) that the transcribed conversations were true and accurate representations of Romo and S.S.'s conversations during the narcotics transactions. Soria also testified that he spoke "the language of narcotics trafficking" and, over the defense's continuing objections, explained certain narcotics slang terms used in the transcribed audio recordings. (Tr. 386).

S.S. testified, by an interpreter, that the audio recordings were true and accurate representations of her conversations with Romo, when arranging the drug transactions and their subsequent conversations during the actual drug transactions; that she assisted Soria and DeFord with preparation of the transcripts; and that the transcripts truly and accurately represented her conversations with Romo.

The State moved to admit the audio recordings and transcripts. Defense counsel objected to the audio recordings and transcripts throughout the trial. In the following colloquy, defense counsel objects specifically to the admission of the transcripts:

[Plaintiff's counsel]: Are we going to play the audio?

THE COURT: No.

[Plaintiff's counsel]: Okay.

THE COURT: It's in Spanish, right?

[Plaintiff's counsel]: Yes, Judge. * * * We had envisioned playing the audio recordings so that the jury could hear kind of the tone of the conversation—

THE COURT: No. They're going to read the statements.

[Plaintiff's counsel]: Yes, Judge.

THE COURT: That's all they're going to do.

* * *

[Defense counsel]: I would have an objection to admitting the transcripts into evidence. * * * [T]hey can be used to assist in listening to the audio recordings but—

THE COURT: The audio is in Spanish.

[Defense counsel]: I understand that, but transcripts are not admissible into evidence. They're only to be used to assist. I would point to—

THE COURT: There's a foundation laid. I've accepted the foundation. I'm allowing the transcripts in. I'm not going to sit here and waste anybody's time by playing a Spanish audio.

* * *

[Defense counsel]: I would just cite to *Grimes v. State,* 633 [N.E.2d] 262, which basically . . . sums up that . . . transcripts are to be used only to assist in

the jury understanding the audio tapes. Thank you.

THE COURT: Right. And the tapes are in Spanish.

[Defense counsel]: I understand.

THE COURT: So do you want me to go through the charade of playing them in Spanish first and then assisting with the translation?

\* \* \*

[Defense counsel]: I believe the law requires that they can only have the transcripts in front of them as they listen to the audio recording.

THE COURT: To assist in understanding?

[Defense counsel]: Right.

THE COURT: Now tell me the point of playing the Spanish audio.

[Defense counsel]: I understand....

THE COURT: Tell me the point of doing that.

[Defense counsel]: No. I don't see any point. I understand it's a unique situation.

THE COURT: Thank you. Objection overruled.

(Tr. 368–370). The trial court later stated, "[W]e're using these transcripts as a substitute [to the audio tapes], something that will help the trier of fact." (Tr. 376). Subsequently, the trial court admitted the audio recordings and transcripts into evidence, but published only the transcripts to the jury. During deliberations, the jury asked to review again the transcripts; however, the trial court refused.

On October 22, 2009, the jury found Romo guilty on all counts. On November 10, 2009, he was sentenced to thirty years in the Department of Correction.

## DECISION

■ Romo argues that the trial court erred in admitting the transcripts into evidence and in allowing Soria to testify as an expert without laying a proper foundation. We review the admission of evidence for an abuse of the trial court's discretion. *Montgomery v. State*, 904 N.E.2d 374, 377 (Ind.Ct.App.2009). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* We do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling. *Id.*

### 1. Admission of Transcripts

Romo argues that the trial court erred in admitting and publishing the transcripts to the jury because: (1) the transcripts were admitted as an exhibit instead of as an aid to the audio recording; and (2) the State failed to lay a proper foundation to establish the accuracy of the transcripts. Romo's Br. at 4–5, 7.

#### a. Transcripts as Exhibit

■ Our Supreme Court has previously established the following standard for use of transcripts of taped statements at trial:

The best evidence of the conversation is the tape itself; the transcript should normally be used only after the defendant has had an opportunity to verify its accuracy and then only to assist the jury as it listens to the tape. If accuracy remains an issue, a foundation may first be laid by having the person who prepared the transcripts testify [that] he has listened to the recordings and accurately transcribed their contents. *Because the need for transcripts is generally caused by two circumstances, inaudibility of portions of the tape under the circumstances under which it will be replayed or the need to identify the speakers, it may be appropriate, in*

*the sound discretion of the trial judge, to furnish the jurors with copies of a transcript to assist them in listening to the tapes.* In the ordinary case, this will not be prejudicially cumulative. Transcripts should ordinarily not be read to the jury or given independent weight. * * * Transcripts should ordinarily not be admitted into evidence unless both sides stipulate to their accuracy and agree to their use as evidence.

*Bryan v. State,* 450 N.E.2d 53, 59 (Ind. 1983) (internal citations omitted) (emphasis added).

In *Bryan,* the Court overtly contemplated two scenarios—inaudibility or a need to identify the speakers—in which a transcript "may" be necessary. The Court also acknowledged that other such circumstances may exist. *Id.* Today, we find that the instant facts present yet a third scenario—one in which the audio recording is *not* "[t]he best evidence of the conversation" because the recording features a language that is beyond the comprehension of the entire jury. *Id.* Here, the record reveals the extent of the trial court's quandary—aware of the general rule regarding the inadmissibility of transcripts; unwilling to "go through the charade of playing [the audio recordings] in Spanish first" to an uncomprehending jury, (tr. 369); and mindful of its duty under the circumstances to assist the jurors in listening to the tapes. *Id.*

Romo cites several cases, including *Bryan, Small v. State,* 736 N.E.2d 742 (Ind.2000), *Blanchard v. State,* 802 N.E.2d 14 (Ind.Ct.App.2004), as examples of cases in which transcripts were found to have been admitted in error, albeit often harmless error. However, these cases are factually distinct from the instant facts because they did not involve audio recordings that were incomprehensible to the trier of fact. In *Bryan, Small,* and *Blanchard,*

there was no existing practical impediment to the trier of fact's ability to review and weigh the evidence presented on the recordings. Thus, the admission of the transcripts in those cases into evidence was error, because the transcripts therein clearly should only have been used as aids to the jury in listening to the recordings, and not admitted as exhibits and afforded independent weight.

Here, however, we find that given the unlikelihood of having a bilingual jury that understands and is sufficiently well-versed in the nuances and/or idiom of the language at issue to accurately comprehend the audio-taped conversation(s), the trial court acted reasonably and within its sound discretion, when it concluded that it was appropriate "to furnish the jurors with copies of a transcript to assist them in listening to the tapes." *Bryan,* 450 N.E.2d at 59. Thus, we cannot say under the circumstances herein that the trial court abused its discretion in admitting the transcripts into evidence and in finding that playing the Spanish audio recordings as the jury perused the English transcripts of the same would not have assisted in the jury's comprehension thereof and would have wasted judicial resources.

### b. Accuracy

Next, Romo argues that the State failed to lay a proper foundation to establish the accuracy of the transcripts. His specific challenge to the transcript appears to be that Elia James—one of four persons involved in preparing the transcript—"did not testify and therefore could not verify the transcript for accuracy." Romo's Br. at 6.

Romo correctly asserts that James did not testify; however, there is evidentiary support in the record for the finding that Soria also "prepared" the transcript, and was, therefore, an appropriate person for the State to call upon to lay the foundation

for its accuracy. At trial, Soria, a fluent Spanish-speaker, testified that he was actually in the vehicle translating Romo and S.S.'s conversation for a federal drug agent at the time the narcotics transactions were occurring. (Tr. 273). He also testified that he, James, S.S., and DeFord were involved in the preparation of the transcripts; that he "read through [James' transcripts] ... while listening to the audio," (tr. 254); that they compared the transcribed conversations with the audio recordings for accuracy and made agreed-upon corrections thereto; and that the transcripts presented at trial were true and accurate representations of the conversations on the audio recordings. *See Grimes v. State*, 633 N.E.2d 262, 264 (Ind. Ct.App.1994) (finding no ground for error where police officer who monitored and partially observed portions of drug transactions recorded on the audio tapes testified as to the accuracy of the audio tapes and transcripts). *See also Bryan*, 450 N.E.2d at 59 (finding that the foundation as to the accuracy of a transcript may be laid by having the person who prepared the transcript testify that he has listened to the recordings and accurately transcribed their contents).

Based upon the foregoing, we find that the State established a sufficient foundation for the accuracy of the transcript. We find no abuse of discretion.

### c. *Prejudice*

 Lastly, Romo argues that he suffered prejudice from the admission of the transcripts without a proper foundation. To demonstrate reversible error, Romo must show that the discrepancy between the tapes recordings and the transcripts constituted inaccuracies which prejudiced his substantial rights. *Farmer v. State*, 908 N.E.2d 1192, 1199 (Ind.Ct.App.2009). An error will be deemed harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Id.*

Romo has not demonstrated that he suffered "the kind of prejudice that would enable him to gain a reversal on this issue." *Bryan*, 450 N.E.2d at 60. We initially note that (1) he does not allege that he lacked an opportunity to review the State's transcript in advance of trial; (2) he has not advanced an alternate transcript of the audio recordings. *See U.S. v. Carrasco*, 887 F.2d 794, 801 (7th Cir.1989) (defendants' failure to challenge specific portions of the government's transcript or to prepare an alternate transcript of recorded conversations between codefendants translated from Spanish into English at trial precluded them from challenging the accuracy of transcripts on appeal); and (3) he has not explained how any inaccuracies in the transcript undermined the theory of his case.[3]

Rather, at trial, Romo challenged the accuracy of the transcripts on the ground that they constituted a police-slanted interpretation as opposed to a literal translation. This challenge to the non-literal translation is not an actionable inconsistency between the transcript and the audio recordings that would give rise to reversible error. *See id.* at n. 19 ("foreign language translation is sufficiently accurate to assist the jury if the translation reasonably

---

3. At trial, Romo also objected to certain parenthetical notations contained within the transcript, wherein the police defined certain seemingly innocuous Spanish terms that have been adopted by narcotics dealers. The trial court sustained Romo's objection and ordered the transcripts redacted to erase those references before the transcripts were published to the jury. Romo, therefore, cannot demonstrate that reversible error arose from said notations.

conveys the intent or idea of the thought spoken"; "translation of most foreign languages to English ... can never convey precisely and exactly the same idea and intent comprised in the original text, and it is unrealistic to impose [a] requirement of exactness before allowing a translation to be considered by a jury").

Here, Soria and S.S. testified that the transcripts were true and accurate representations of the recorded audio conversations. Moreover, Romo was free to offer testimony and/or to advance a literal or alternate translation of the audiotapes, but failed to do so. We, therefore, conclude that the translated transcripts reasonably conveyed Romo's stated intent and ideas such that the transcripts were sufficiently accurate to assist the jury. We cannot find reversible error in this regard.

### 2. *Foundation for Expert or Skilled Witness Testimony*

█ Romo argues that the trial court erred in admitting Detective Soria's "opinion testimony that he was familiar with the language of narcotics trafficking," because the State did not establish any foundation for his opinion testimony. Romo's Br. at 8. Specifically, he argues that the State improperly asked Soria to "explain certain terms in the transcripts (State's exhibits 34, 35, and 36) that had been admitted into evidence and provided to the jury." Romo's Br. at 7. He argues that "[w]hether Soria testified as a 'skilled' witness pursuant to Evid. R. 701 or as an 'expert' pursuant to Evid. R. 702, the foundation to establish him as either is lacking [ ]." Romo's Br. at 7. We disagree.

██ The admission of opinion testimony is within the discretion of the trial court. *Julian v. State*, 811 N.E.2d 392, 399 (Ind.Ct.App.2004). Pursuant to Indiana Evidence Rule 701, a lay person or skilled witness may testify as to opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. The requirement that the opinion be "rationally based" on perception "means simply that the opinion must be one that a reasonable person normally could form from the perceived facts." *Mariscal v. State*, 687 N.E.2d 378, 380 (Ind.App.Ct.1997).

Here, Soria's testimony was "rationally based" on his general experience and training. He testified that he understands and speaks Spanish fluently; that he has been an IMPD officer since 2004; that he is a member of the Metro Drug Task Force; and that he has achieved the rank of detective. By virtue of Soria's position on the Metro Drug Task Force and his elevated rank, we may infer that he possesses knowledge beyond that of the average juror with regard to the dealing of narcotics, and was, thereby, sufficiently familiar with the language of narcotics trafficking to provide testimony regarding the meaning of drug-dealing terminology employed by Romo. It appears from the record that Soria's opinion testimony was: (1) based upon his personal experience as a narcotics investigator; (2) was helpful to the jury's understanding of narcotics slang terms used by Romo in the transcribed audio-taped conversations; and (3) was helpful to the determination of whether Romo engaged in drug dealing activity. Thus, we conclude that Soria's testimony was rationally base" on his perception, and that the trial court did not abuse its discretion in allowing his testimony.

Affirmed.

BAKER, C.J., and CRONE, J., concur.