Stanley STOKES, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2007–SC–000006–MR.

Supreme Court of Kentucky.

Dec. 18, 2008.

Emily Holt Rhorer, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Julie Renae Scott, Assistant Attorney General, Office of the Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Stanley Stokes, was convicted of two counts of sodomy and sentenced to thirty years in prison. On appeal, he claims the trial court erred by allowing the definition of a medical term to be read into evidence outside the context of an expert witness's testimony, and by answering a jury question during penalty phase deliberation. Finding no error requiring reversal, Appellant's conviction and sentence are affirmed.

## I. Background

Appellant's son, Kevin Stokes, and his wife, Tracey, had custody of the minor child involved in this case, H. B., a twelve-year-old girl who was Tracey's adopted sister. On September 3, 2005, Kevin took H. B., her older sister, and his biological daughter to visit Appellant at his home. While the other two girls mowed the lawn, H. B. gave Appellant's dog a bath. Kevin and a friend, Ronnie Gibson, were working on a scooter in the garage, and Appellant was with them. Appellant later followed H. B. into the house and did not immediately come back out. Kevin then looked through a window to see where they were, and he testified at trial that he saw H. B. sitting in a chair with Appellant standing in front of her. Kevin opened the door and asked what was going on, at which time Appellant jumped back and Kevin saw Appellant pull his penis out of H. B.'s mouth. Appellant claimed that he was merely hugging the child, and indicated

that it could be nothing more because he suffered from erectile dysfunction. When H. B. confirmed what Kevin had seen, Kevin beat Appellant, until Appellant nodded that he had acted as the child claimed, and Gibson dragged Kevin off Appellant.

H. B. claimed that Appellant had made her perform sex acts three or four times previously, and that the first time he had slapped her and threatened to force her if she did not do as he demanded. She claimed that Appellant held a knife to her throat and told her that if she told anyone, he would kill her and jeopardize her family. Further, she testified that Appellant did have an erection during the July incident.

Consequently, Appellant was charged with one count of first-degree sodomy and one count of second-degree sodomy. At trial, Kevin, H. B. and Gibson testified to the above events. Appellant testified in his own behalf, and raised as his defense that he could not get an erection due to impotence, and placed into evidence his medical records concerning this health problem, which indicated that he had been seeing a urologist for this condition off and on since 1994. Those records indicated that no physical cause for Appellant's dysfunction could be found, and that the doctor thought the problem was probably "psychogenic." The records also indicated that, on occasion, Appellant was able to function sexually. Appellant, however, claimed that by 1996, he could not achieve an erection at all.

During rebuttal, the Commonwealth asked to be allowed to read the definition of "psychogenic" from an unnamed medical dictionary as a learned treatise pursuant to KRE 803(18). Defense counsel objected that under the rule, a learned treatise must be introduced through an expert witness. In response, the Commonwealth replied that the trial court could simply take judicial notice of the definition.

The trial court ruled that no expert would be required if it took judicial notice that the dictionary was a learned treatise, to which defense counsel again made proper objection and moved for a mistrial, which was overruled. The trial court then informed the jury that it was recognizing "this book," which still remained unidentified, as a learned treatise, and that what the Commonwealth was going to read was reliable and could be considered during deliberations. The Commonwealth then defined psychogenic as "produced or caused by psychological factors."

In closing, the Commonwealth argued that Appellant's dysfunction "related to a psychological type of problem, in his head," as there was nothing physically wrong with Appellant, including his testosterone levels. The Commonwealth pointed out that the medical records indicated that as of February 1995, Appellant had had intercourse three or four times and, "Gets good erections when he is able to have intercourse." The prosecutor then argued that Appellant was dysfunctional "because adult women do not sexually arouse him.... He is aroused by little girls." The defense objected that there was nothing in the medical records to support this argument, nor had there been any testimony to that effect. Nonetheless, the trial court ruled, over the defense's objection, that this statement was "a rational, reasonable inference." On further complaint, the trial court then told the jury it could "draw any reasonable inference from the evidence that's been presented.... That's for you to decide, you make the decision yourself."

Appellant was convicted of both charges, and the jury recommended the maximum sentence on each. The trial court imposed a sentence of twenty years on first-degree

sodomy and ten years on second-degree sodomy, and ran them consecutively for a total of thirty years. This appeal followed as a matter of right.

## II.  Analysis

### A.  Learned Treatise and Judicial Notice

■ Appellant argues that the trial court abused its discretion by taking "judicial notice" of a medical dictionary as a "learned treatise." While there is much confusion of terms here, the trial court committed no error when it allowed the Commonwealth to read a definition of "psychogenic" into the record.

■ Under KRE 803(18), known as the learned treatise rule, statements from such a document are not excluded by the hearsay rules, even though the declarant is not available as a witness, when these statements are used in questioning an expert witness, either on direct or cross, if the statements are established as a reliable authority either by the witness, other expert testimony, or by judicial notice. The judicial notice used in this rule goes only to whether the document is a reliable authority, not that the statements read are adjudicative facts. As always, the weight of the authority must be determined by the trier of fact.

Judicial notice under KRE 201, however, concerns only adjudicative facts. KRE 201(a). If a fact is judicially noticed under this rule, the jury must be instructed to accept such fact as conclusive. KRE 201(g). To be properly judicially noticed, the fact must not be subject to reasonable dispute, because it is generally known or can be determined by resort to sources whose accuracy cannot be reasonably questioned. KRE 201(b).

Here, Appellant was allowed to introduce his medical records regarding his treatment over a number of years for erectile dysfunction, by which he bolstered his defense that H. B. was lying, that he was incapable of an erection, and that he had only been giving her a hug. The records, however, also indicated that he had been able to occasionally have intercourse with an erection, and that his problem was probably psychogenic. What the Commonwealth wanted to do, though it couched its request as recognition of a learned treatise, was ask the court to take judicial notice of the definition of "psychogenic" and to read the definition to the jury as an adjudicative fact to establish that Appellant's dysfunction was psychological rather than physical.

■ A trial court may take judicial notice of the definition of a word as an adjudicative fact where the definition of a term is indisputable, that is, where it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." KRE 201(b)(2). Essentially, KRE 201 allows judicial notice to be taken of "facts 'which can be determined from unimpeachable sources.'" Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.00[3][c], at 10 (4th ed.2003) (quoting 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 51 (2d ed.1994)). As Professor Lawson has noted, such sources include general authorities such as "encyclopedias, calendars, maps, medical and historical treatises, almanacs, and public records." *Id.* Beyond doubt, dictionaries fall within the same class of "unimpeachable sources," and thus the definitions contained in them may be judicially noticed, so long as they are indisputable. *See Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir.1993) (holding that district court was within its discretion to take judicial notice of the dictionary definition of a word); *B.V.D.*

*Licensing Corp. v. Body Action Design, Inc.,* 846 F.2d 727, 728 (Fed.Cir.1988) ("Courts may take judicial notice of ... dictionaries."); Richard H. Underwood & Glen Wissenberger, *Kentucky Evidence 2005–2006 Courtroom Manual* 44 (2005) ("Judicial notice is taken of the English language.... Representative authoritative sources for verification [of facts] include such materials as historical works, science and art books, *language and medical journals and dictionaries,* calendars, encyclopedias ...." (emphasis added)); *see also Werk v. Parker,* 249 U.S. 130, 132–33, 39 S.Ct. 197, 63 L.Ed. 514 (1919) ("We deem it clear, beyond question ... that the court was justified in taking judicial notice of facts that appeared so abundantly from standard works accessible in every considerable library."); Samuel A. Thumma and Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries,* 47 Buff. L.Rev. 227, 248 (1999) (noting that "by 1920, the [Supreme] Court had decided that taking judicial notice of dictionary definitions unquestionably was proper"). Indisputability of a definition can be buttressed by cross-referencing the definition with other dictionaries or authorities. Specifically, judicial notice may be taken of the definitions of medical terms from a medical dictionary, *Campbell v. Shelton,* 727 N.E.2d 495, 502 (Ind.Ct.App.2000), and those definitions are admissible into evidence in a jury trial, assuming of course that the other requirements of the judicial notice rule are met:

> We are mindful that there is a distinction between referring to a dictionary in a factfinding setting for the purpose of judicially noticing the meaning of a word, on one hand, and consulting such a source upon appellate review to discern the meaning of a term for purposes of, for example, statutory construction.... Nevertheless, the preceding authority reflects that our courts generally regard dictionaries as 'sources whose accuracy cannot reasonably be questioned.' *See* Evid. R. 201(a). We conclude, therefore, that a court may take judicial notice of a dictionary definition of a word, so long as the other conditions set out in Evid. R. 201 are met.

*Id.* at 501.

No suggestion has been made that the definition read to the jury in this case was not accurate, and the Appellant did not object to the content of the definition, only to the medical dictionary being treated as a learned treatise. The trial court intended to take judicial notice of the meaning of the term "psychogenic," and found a medical dictionary to be an indisputable source of the definition. Since the accuracy of the definition was readily ascertainable, the trial court did not abuse its discretion in allowing it to be read to the jury. Whether it was appropriate for this evidence to be introduced during rebuttal is perhaps another matter, but this has not been raised on appeal, and does not rise to the level of a palpable error.

The Appellant also takes issue with the use the Commonwealth made of this definition in closing argument. Since it was appropriate for the trial court to take judicial notice of the definition of "psychogenic," it follows that it was appropriate for the Commonwealth to comment on that definition in closing argument, provided its inferences were reasonable. It is true that there was no specific testimony before the jury that stated Appellant could not be aroused by adult women, but only little girls. However, Appellant testified that he could not get an erection for intercourse by 1996, while H. B. testified that he in fact did have an erection during at least the July episode. From this, it could be inferred that due to the psychological nature of his dysfunction, he could only

190

achieve an erection with a child. While the Commonwealth did state this factual claim definitively, rather than couching it in the language of possibility, it did so in the context of *argument*. There was evidence to support the assertion as a reasonable inference, and not mere speculation. The argument was thus not improper, and certainly did not rise to the level of prosecutorial misconduct. There was no error.

## B. Penalty Phase Deliberations

■ Appellant also complains that during penalty phase deliberations, the trial court gave the jury additional factual and legal information to which it was not entitled.

In the penalty phase, under truth in sentencing, the Commonwealth informed the jury that Appellant had previously been convicted of second-degree sexual abuse. On the record, but outside the hearing of the jury, the Commonwealth indicated that it would not send the certified copy of the prior conviction back with the jury because Appellant had previously been charged under a higher degree of the offense. In closing, the Commonwealth specifically referenced this offense, stating that it was not Appellant's "first time" and directed the jury to consider what Appellant had done in the past in recommending a sentence. The jury then retired to deliberate.

A few minutes into the deliberations, the jury sent out this question: "We want to know if the prev. conv. was on a child?" The Commonwealth first argued that the judge could do this because the arrest warrant in the prior case stated that the Appellant committed first-degree sexual abuse against a minor less than 12 years of age. When defense counsel objected, the trial court researched the issue, and determined that pursuant to *Robinson v. Commonwealth*, 926 S.W.2d 853 (Ky.1996), he

could read to the jury the elements of second-degree sexual abuse. The defense attorney objected that this was new evidence that had not been presented during the Commonwealth's penalty phase case, and that all the trial court could do at that point was decline to answer and tell the jury to follow the instructions. The Commonwealth actually agreed that the trial court should not tell the jury that the victim of that offense was a child.

Nonetheless, the trial court stated that since the prosecutor *could* have told the jury the victim was a child, the question was whether it now *should* tell them. Concluding that since the matter involved truth in sentencing, he determined to tell the jury that the prior offense involved subjecting a person less than 14 years of age to sexual contact, and that he would define sexual contact as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying the sexual desire of either party." Over continuing defense objection, he did so, and within five minutes, the jury fixed the maximum sentences on both counts before them, and recommended that they run consecutively for a total of thirty years.

All that is properly allowed under *Robinson* is a general description of the crime. In that case, the trial court allowed the victim of the prior crime to testify at length as to the specifics of the assault against her. Defense counsel objected that this resulted in the defendant being in effect tried again for that offense, and this Court agreed. To clarify, this Court held that all that is necessary for truth in sentencing is "a general description of the crime." *Id.* at 855. To illustrate what would be appropriate in the *Robinson* case, the Court stated, "In this case, it would be sufficient to introduce the judgment with testimony that defendant assaulted the woman with whom he had been

living." *Id.* In a later case, *Hudson v. Commonwealth,* 979 S.W.2d 106 (Ky.1998), this Court specified that the factual circumstances in the warrants or uniform citations could not be read to the jury. What is permissible thus lies somewhere between the rules stated in these two cases.

Here, the trial court gave no more than a general description of the prior offense such as would be allowed under *Robinson,* including that the crime had been committed against a person under the age of fourteen, but then went farther by defining what sexual contact meant. This is considerably more than the limit set in *Robinson,* in that the definition falls into the language typically used in warrants and indictments, and gives more specifics than is necessary for the jury to know to ascertain the nature of the offense. Possibly, the sword cuts both ways here, because the term "sexual contact" could be construed as worse than it actually is. Thus, defining terms in other offenses creates the very kinds of collateral issues this Court disfavored in *Robinson.* Despite this, the definition the trial court read was simply a statement of the statutory definition of the term sexual contact as the word would be defined if given in a jury instruction. Thus, in this case, even though it is better practice not to be too specific in the "general statement" of what occurred, any error is harmless.

■ The greater problem here is how to treat the introduction of additional evidence after the case has been submitted and the jury has begun deliberations. No timely motion to reopen was made; instead, the judge introduced new evidence in response to a question from the jury as to whether the victim of the prior offense was a child. Those facts were given weight by being delivered by the trial court. Appellant had no opportunity to introduce possible corrective evidence, and was given no opportunity to argue to the jury regarding the additional evidence. The Commonwealth had closed, and had concerns about the court telling the jury the age of the victim in the prior case.

Generally, courts are reluctant to reopen proof after a case has been closed, but trial courts do have the discretion to do so. RCr 9.42(e) (giving court discretion to allow evidence-in-chief after a side has closed its proof); *Marshall v. Commonwealth,* 625 S.W.2d 581, 583 (Ky.1981). The test generally is whether an injustice is likely to result if the new evidence is not put before the jury. See RCr 9.42(e) (allowing such new proof only "for good reason in furtherance of justice").

However, there is very little authority about reopening proof after the case has been submitted to the jury and it has begun its deliberations. One case which does frame the issue squarely, but that has facts different from this one, is *Henry v. United States,* 204 F.2d 817, 821 (6th Cir. 1953). In *Henry,* after the jury deadlocked, it requested the court to allow it to rehear the testimony of some of the witnesses. Over defense objection, the court allowed the testimony of two witnesses to be played back for the jury. In particular, the defense objected to replaying the testimony of one witness that had so annoyed the judge with his evasive answers that the judge took over the questioning and castigated the witness. In reversing, the Sixth Circuit pointed out that replaying testimony where the judge projected a negative view of the witness's credibility overemphasized that testimony to the point of unfairness. In reaching its decision, however, the Sixth Circuit reviewed Kentucky law in regard to reopening and communication with the jury and concluded: "There is no iron-bound, copper-fastened, double-riveted rule against the admission

of evidence after both parties have rested upon their proof *and even after the jury has entered upon it deliberations.* Considerable latitude in discretion is vested in the trial judge in this respect." *Id.* at 820 (emphasis added). The Sixth Circuit did recognize that as a general practice, the parties must consent or the evidence must relate to some non-controversial matter essential to complete the record before evidence may be introduced after jurors have begun deliberations. *Id.* at 820–21.

RCr 9.74 specifically says, "No information requested by the jury or any juror after the jury has retired for deliberation shall be given *except* in open court in the presence of the defendant (unless the defendant is being tried in absentia) and the entire jury, and in the presence of or after reasonable notice to counsel for the parties," (Emphasis added.) Had the sentence ended after the word "given" the rule would clearly proscribe giving additional proof to the jury after deliberations have begun. With the addition of the "except" language, the only reasonable inference is that such proof can be given, provided the qualifiers are met. Though it is rare, such a procedure is not unheard of in Kentucky law. *See Elkins v. Commonwealth,* 245 Ky. 199, 53 S.W.2d 358 (1932) (holding that court abused discretion in not allowing defendant to call impeachment witness after jury began deliberations); *Easterling v. Commonwealth,* 201 Ky. 485, 257 S.W. 28, 29 (1923) ("While trial courts have the power to reopen a case after submission and before verdict, for the purpose of receiving further evidence, the matter is one that addresses itself to their sound discretion....."); *Burk v. Commonwealth,* 28 Ky. (5 J.J.Marsh) 675 (1831)

(allowing reexamination of a witness after the jury began deliberations).

Some cases under Section 249 of the old Criminal Code of Practice,[1] the predecessor to RCr 9.74 appear superficially to counsel against this understanding. For example, in *Houston v. Commonwealth,* 270 Ky. 125, 109 S.W.2d 45 (1937), during deliberations, the jury asked the court what effect a conviction would have under the Habitual Criminal Act on the defendant obtaining a pardon. The judge told them the conviction would not affect obtaining a pardon. The Court, in reversing, held that this was a question on a point of law not involved in the case, and indicated that the judge should have said only that he was required to give the jury the law of the case, that he had done so, and that that was all he was allowed to tell them. Taking this as a model, this has become the standard approach trial courts make to most jury questions. But *Houston* was premised on giving the jury evidence or legal instruction to which it was not entitled, not on finding the trial court's responding to the jury's question to be per se improper. The case does not mean that under certain circumstances, it may not be proper to introduce new evidence after jury deliberations have begun.

Certainly, those instances should be rare and very carefully thought out. As the Sixth Circuit pointed out in *Henry,* "After the jury has reported its inability to agree upon a verdict, it is, in our opinion, incumbent upon the trial judge to exercise extreme care in reopening the case for the introduction of further testimony or in permitting any evidence to be restated or reread to the jurors. Unless restraint is

---

1. At the time, Section 249 read: "After the jury retires for deliberation, if there be a disagreement between them as to any part of the evidence, or if they desire to be informed on a point of law, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the counsel of the parties."

exercised by the judge, it may well be that he would permit undue emphasis to be placed upon portions of the testimony, if such portions were called for by the jury." 204 F.2d at 821. This caution applies even more when the jury is not in disagreement over the testimony in the record but is looking for additional evidence.

In this case, the judge's answer to the jury question did apply to facts and a point of law that is relevant to the case. The purpose of truth in sentencing is to allow jurors to consider a criminal defendant's history in assessing his likelihood of re-offending and what the appropriate level of punishment for the current offense is. It is certainly relevant to this determination that Appellant had previously committed a sexual offense against a minor. While it would be inappropriate to introduce evidence of character to prove propensity in the guilt phase of the trial, character and propensity are at the heart of sentencing.

It may be arguable that there was no necessity to give the jury this additional evidence during deliberations; on the other hand, it may be arguable that injustice would occur if the trial court did not do so. That determination is within the sound discretion of the trial court, and this Court cannot say that there was an abuse of that discretion.

The remaining question then is whether giving the additional information unduly emphasized that portion of the testimony—the primary concern in *Henry*. Undoubtedly, the evidence was given weight by being delivered by the trial court; Appellant had no opportunity to introduce corrective evidence or to challenge the evidence before the jury; Appellant was given no opportunity to argue to the jury about this evidence; and the Commonwealth had concerns about the judge telling the jury the age of the child in the prior offense. However, given that the

Commonwealth could have presented this same evidence to the jury had it chosen to do so during its case-in-chief (and would be able to present it at retrial were the sentence reversed by this Court), the deciding factor must be whether the mere presentation of this evidence by the judge is sufficient to create a fundamentally unfair trial by placing undue emphasis on the evidence. This Court does not believe that it does, and thus finds no error.

### III. Conclusion

For the foregoing reasons, the judgment of the McCracken Circuit Court is affirmed.

All sitting. All concur. ABRAMSON, J., also concurs by separate opinion. CUNNINGHAM, J., concurs because the information given to the jury was only the uncontroverted definition of an offense already introduced, not new "proof," and was therefore not error—harmless or otherwise.

Concurring Opinion by Justice ABRAMSON.

I concur because I cannot fault the majority's analysis of the issue raised by the trial judge's provision of information to the jury after they had retired for deliberations in the penalty phase. However, I am compelled to state even more emphatically that the trial judge is not, and should not be viewed, as a safety net for counsel, standing ready to supply what they have inadvertently omitted. Information conveyed by a trial judge typically is accorded heightened respect by jurors and the potential for undue emphasis is great. Only in the rarest of instances will this practice, in my view, pass muster.