RENDERED: MARCH 26, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000249-MR

TAMMY ROBERTS                                       APPELLANT

V.              ON APPEAL FROM GRAVES CIRCUIT COURT
HONORABLE TIMOTHY C. STARK, JUDGE
NO. 17-CR-00131

COMMONWEALTH OF KENTUCKY                   APPELLEE

## OPINION OF THE COURT BY JUSTICE WRIGHT

## REVERSING, VACATING, AND REMANDING

A Graves Circuit Court jury convicted Appellant, Tammy Marie Roberts, of murder and recommended a twenty-year sentence. Roberts was sentenced in accordance with the jury's recommendation, and now appeals to this Court as a matter of right. Ky. Const. §110(2)(b).

Roberts raises four claims of error in her appeal, alleging: (1) the trial court erred in failing to grant a mistrial, (2) the trial court erred in refusing to instruct on self-defense and imperfect self-defense, (3) the trial court erred in ruling she did not qualify for the domestic violence exemption, and, (4) that she should be granted a new trial because of cumulative errors. For the following reasons, we reverse Roberts's conviction, vacate her sentence, and remand to the trial court for further proceedings consistent with this opinion.

# I. BACKGROUND

James Pinion died on February 10, 2017, from a single stab wound to the chest. Roberts, Pinion's girlfriend, was charged with his murder. Pinion and Roberts lived together and shared a two-bedroom trailer with David and Amy Hogg, a married couple. All four roommates frequently used drugs.

The night Pinion died, the Hoggs overheard an argument between Pinion and Roberts. The argument resulted from a trip to the Dollar General Store by Roberts and Amy. The toxic and turbulent relationship between Pinion and Roberts was such that Pinion required Roberts to acquire his permission before leaving the trailer—and to show him her underwear both before leaving the trailer and after returning home. The day in question, Roberts failed to obtain his permission, leading to an argument when she got home.

At some point, Amy heard blows being exchanged. Then, Roberts exited the bedroom and talked to Amy in the kitchen for a few moments. Roberts told Amy that Pinion had her medication and would not give it back to her. Then, shortly before the stabbing, David heard Roberts and Pinion arguing and went into their bedroom. Roberts told David that Pinion had her money and would not give it back. David told Pinion to return the money and Pinion threw three twenty-dollar bills on the bed. Police would later find three blood-soaked twenty-dollar bills in the shoes Roberts wore. Shortly after David left the room with the two still arguing, he heard Roberts scream "help" and saw Pinion slumping in the hallway bleeding. Pinion was declared dead at the hospital.

2

In multiple statements to police, Roberts claimed Pinion accidentally fell on the knife when he got his foot tangled in a sheet. Roberts maintained there was no domestic violence the night Pinion was stabbed even after multiple attempts by police to get Roberts to admit to stabbing Pinion in self-defense. This denial was made despite both Amy and David hearing an argument prior to the stabbing, Amy reporting the sound of someone being hit, and fresh bruises and apparent red slap marks on Roberts observed by police that night.

Prior to trial, the Commonwealth gave Kentucky Rules of Evidence (KRE) 404(c) notice that it intended to introduce one of Roberts's prior bad acts: a 2003 first-degree assault conviction from Fulton County. Roberts filed a motion in limine seeking to prevent introduction of this prior assault. The trial court issued a written order stating the Commonwealth could use information regarding the prior crime in its case-in-chief if it first laid the proper foundation.

The morning of trial, Roberts sought clarification of the court's earlier ruling. In response, the Commonwealth indicated it would redact those portions of Roberts's various recorded statements to police in which officers confronted her with the prior assault. However, when the recordings were played in the presence of the jury during trial, numerous statements were played concerning the prior assault.

Roberts did not testify. She tendered and argued for self-defense language in the murder instruction as well as for imperfect self-defense instructions for second-degree manslaughter and reckless homicide. The trial

3

court overruled the tendered instructions, finding no evidence in the record to support them. The jury convicted Roberts of wanton murder and recommended a twenty-year sentence.

After the jury convicted Roberts, she moved the trial court to apply the domestic violence victims' exemption to change her parole eligibility from 85% to 20%. The trial court overruled the motion finding there was no evidence connecting the crime with an act of domestic violence.

## II. ANALYSIS

### A. Mistrial

During trial, the Commonwealth played recordings of police interviews with Roberts. Multiple times in playing these recordings, the Commonwealth failed to follow the trial court's order to remove references to a prior assault Roberts committed fourteen years prior to Pinion's death. Roberts made three mistrial motions during trial after the Commonwealth played the inadequately redacted recordings.

#### 1. KRE 404(b)

As a preliminary matter to determining whether the trial court abused its discretion in failing to grant a mistrial, we examine whether the trial court erred in ruling to allow the admission of KRE 404(b) evidence regarding the fourteen-year-old Fulton County assault.

While KRE 404(a) states the general rule that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," the rule goes on to

4

enumerate exceptions when evidence of one's character may be used. Specifically, KRE 404(b) reads, in pertinent part:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
>> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

In examining whether the prior assault fit within the KRE 404(b) exception, the trial court examined the similarities in the two crimes. The trial court reviewed tendered documents from the 2003 assault in conducting its review. In 2003, Roberts and her then-boyfriend, Louis Estrada, got into a physical altercation. Roberts alleged Estrada had held her by her head and punched her. According to Roberts, she stabbed him after he kept "getting in her face." Estrada countered that Roberts grabbed the knife while the two were arguing. He said she lunged at him and stabbed him in the back as he was walking away. Roberts ultimately pleaded guilty to first-degree assault in that case after initially claiming it had been an accident.

The trial court emphasized the similarities in the cases, noting that in both situations: Roberts's victim was her then-boyfriend, Roberts and her victim had been involved in an argument, Roberts said she had been hit, Roberts stabbed the victim, and Roberts claimed an implausible story. After explaining its reasoning, the trial court found that admission of the prior assault showed absence of accident, motive, and intent pursuant to the exceptions contained in 404(b)(1) allowing the admission of certain evidence of

5

other crimes. Therefore, the trial court found that the Commonwealth could use evidence of the prior assault in its case-in-chief so long as it laid a proper foundation. Notably, the trial court instructed the Commonwealth it could not rely on hearsay to establish the prior conviction and it was disinclined to allow a certified copy of the prior conviction to come into evidence. The Commonwealth responded that it would have an officer from Fulton County present to testify regarding Roberts's prior assault.

On appeal, "[w]e will not disturb a trial court's decision to admit evidence absent an abuse of discretion." *Matthews v. Commonwealth*, 163 S.W.3d 11, 19 (Ky. 2005) *citing Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky. 1996). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). We hold that the trial court abused its discretion by denying Roberts's motion in limine and ruling to allow the Commonwealth to introduce evidence concerning the 2003 assault.

While the trial court was correct that the facts surrounding Roberts's former stabbing of a boyfriend were somewhat similar to those in her stabbing of Pinion, it erred in determining those similarities made the evidence admissible. We addressed this issue in *Driver v. Commonwealth*, 361 S.W.3d 877 (Ky. 2012). In Driver's trial for charges arising from the assault of his current-wife, the Commonwealth sought to introduce evidence that he had assaulted his former wife twelve years earlier. *Id.* at 885. In that case, we

6

noted that "[b]ecause prior acts of violence or threats of violence against persons other than the victim in the case on trial have significantly less probative value than similar prior acts and threats against the same victim, as a general rule 'specific threats directed against third parties are inadmissible.'" *Id.* at 885-86 (quoting *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky. 2004)). We recognized in *Driver* that "[a]n exception has been recognized when the threat against the third person is so close in time to the charged offense as to be considered a part of the same transaction." *Id.* at 886. There is no assertion here that Roberts's stabbing of Estrada fourteen years earlier was part of the same transaction as her stabbing of Pinion.

In *Driver*, this Court ultimately relied on *Barnes v. Commonwealth*, 794 S.W.2d 165 (Ky. 1990), in holding that the evidence of assault of a third party twelve years earlier was inadmissible. In *Barnes*, this Court held, "[a]cts of physical violence, remote in time, prove little with regard to intent, motive, plan or scheme; have little relevance other than establishment of a general disposition to commit such acts; and the prejudice far outweighs any probative value in such evidence." *Id.* at 169. Just as in *Driver*, the trial court here erred in ruling that the Commonwealth could present evidence of a similar more-than-decade-old crime against a third party. Such evidence is not properly admissible under KRE 404(b) as it is too remote in time.

For the above reasons, the trial court abused its discretion in ruling to allow the KRE 404(b) evidence of Roberts's past crime the Commonwealth sought to introduce. However, its error in this ruling did not, in and of itself,

7

prejudice Roberts. The trial court had ruled that the Commonwealth could not present this evidence without first laying a proper foundation. The Commonwealth did not do so. Rather, the Commonwealth, *against the trial court's order*, improperly introduced the evidence (which should have been ruled inadmissible from the start) by playing a recording of one of Roberts's police interviews which included numerous references to the prior crime. As there was no proper foundation laid for the evidence, the jury never heard things such as how long ago the previous stabbing had occurred. In the next subsection, we shift our focus to whether the trial court erred in denying Roberts's numerous motions for mistrial based upon the playing of those recordings.

### 2. Inadmissible Evidence of Prior Crime Presented to the Jury

Roberts claims the trial court abused its discretion when it denied her mistrial motions after the Commonwealth played references to her prior Fulton County assault in its case-in-chief. The trial court, as discussed above, denied Roberts's motion in limine seeking to exclude references to this prior assault evidence, and, instead, required the Commonwealth to lay a proper foundation prior to the admission of evidence. We have already determined that this ruling by the trial court was erroneous. We are now tasked with determining whether the admission of this evidence required the trial court to grant Roberts's mistrial motions.

During trial, the Commonwealth never laid a foundation for admission of evidence of Roberts's prior crime. Therefore, the Commonwealth did not follow

the trial court's order (though it was erroneous on other grounds as we held above). Rather, the Commonwealth repeatedly put the improper evidence before the jury through references contained in a police interview with Roberts. In fact, shortly after the Commonwealth's case began, the court and parties faced problems with the video recordings running afoul of the trial court's pretrial order requiring foundation prior to the admission of evidence regarding the 2003 assault. Specifically, when the Commonwealth played video of Roberts's police interviews, an officer brought up her prior assault conviction, saying: "[n]ow, we know that you have an assault first conviction on your record. We looked it up. We know you have already been down this road to some degree. You've assaulted somebody with a dangerous instrument, a deadly weapon. We know that you did it . . . ." At that point, the trial judge told the Commonwealth to stop the video and defense counsel moved for a mistrial. The trial court denied that motion and admonished the jury to ignore the mention of past events as, "at [that] time" it had no relevance.[1]

As we noted in *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003), "[a] jury is presumed to follow an admonition to disregard evidence and the admonition thus cures any error." Therefore, even though the evidence should not have been admitted, the admonition cured this particular error.

---

[1] We note that all the references to the 2003 assault in this case came from the Commonwealth playing video statements. Recorded statements are significantly different from live witnesses. Recorded statements are entirely within the control of the offering party. They are, for example, vastly different from a lay witness who, in an isolated event, improperly answers a question with an unresponsive and prejudicial answer.

Following the admonition, trial broke for the day. Even after the trial court stopped the playing of the interview—allowing the Commonwealth overnight to redact the video to remove the references for which it had laid no foundation—the Commonwealth failed to do so and played several more references to the 2003 assault the next day. When trial resumed, the Commonwealth began its presentation of evidence by restarting the video from the beginning that the trial judge had ordered stopped the evening before. When the video reached the portion of the interview discussing the prior assault, the Commonwealth simply muted the sound and let the tape continue playing—resuming the sound once the offending portion ended. The trial court advised the jury that the muted sections were due to technical difficulties in the recording transfers. However, the jury had heard the same section the day before with the audio regarding Roberts's prior conviction.

Shortly after the Commonwealth resumed playing the video following the admonition, the jury heard officers speaking to Roberts several more times about the Fulton County assault. In one of those exchanges, the officer said,

> And you're the knife person. You're the one who's . . . stuck people with knives before. You've already done that—been convicted of it. . . . Right shoulder blade area, same area. You stabbed the man the same way, you got it down pat. You know what to do. Your weapon of choice. Steak knife. Same thing. You did it once with a steak knife. Now you have done it twice.

Minutes later, the jury heard the officer in the interview say, the Hoggs "ran off and left you. Every one of them ran off and left you with a dying man. They didn't want no part of this *because they knew you done stabbed somebody before.*" (Emphasis added.) And then, within three minutes of hearing that

10

statement, the jury heard the officer in the recording say, "It's the exact same thing you did the last time. You stuck somebody with a knife. You changed your story."

These statements about the prior assault came in within minutes of one another and defense counsel failed to make contemporaneous objections after each of these statements came in. However, counsel did renew his motion for a mistrial after the last of these references. The trial judge denied the motion, indicating that he had missed the improper references—and that if he had missed them, the jury likely had as well.

The trial court's response was wholly inadequate. Once the issue was raised, the trial court should have taken the time necessary to review that portion of the video being challenged to make a determination as to whether improper evidence had been presented to the jury. The trial court could have then taken appropriate action based on that review. Instead, the trial court interjected his belief that since *he* missed the reference, so must the jury. Nothing in the record supports this belief. The trial court failed to review the improperly admitted evidence so that it could make a ruling based on its admission.

The combination of the Commonwealth introducing multiple improper references to the prior assault, the lack of defense counsel raising contemporaneous objections, and the trial court's failure to take proper corrective action in response to the continued improper references to Roberts's prior crime—or to even review the record so that it could make an informed

11

ruling as to evidence it admitted it had not paid any attention—left Roberts in an untenable situation, seriously imperiling her right to a fair trial. However, the prejudicial damage was not finished, as even more impermissible references continued in the remaining video statements played by the Commonwealth.

Following Roberts's second mistrial motion and a break, the Commonwealth resumed playing the video. Soon thereafter, the officer on the recording can be heard telling Roberts:

> And here's the thing, when it comes in at court that this has already happened to you once—and it will, it will during your sentencing phase is when it will come in—that you have already done this before, you've already cut somebody, them people gonna know all of this and we're gonna parade you around up here in the district courtroom, in front of all these people and we're just gonna tell them that you're a person that keeps subjecting yourself to a violent lifestyle, and abusive lifestyle that you keep getting beat up and this is how you react to it. And we can prove that from past events.

Finally, half an hour later in the interview the officer said, "Tammy, *who has been in trouble before* and doesn't want to be in trouble again." (Emphasis added.)

Again, defense counsel did not contemporaneously object to each of these statements referencing the 2003 assault. However, counsel did renew his motion for a mistrial at the end of the taped interview based upon these references. The trial judge denied the motion, indicating the references were vague. The trial court offered to give the jury another admonition. Defense counsel indicated he would think about it, but never requested the trial court to admonish the jury.

12

Approximately thirty minutes into deliberations, the jury sent out a question, reading: "[t]he jury heard questioning in the 3rd interview about another episode with a knife. Some conversations were deleted but some weren't. Can we use the ones that weren't muted? We are curious." Defense counsel immediately renewed his motion for a mistrial. The trial judge denied this fourth mistrial motion, brought the jury out, and told them: "[t]he short answer is no. The long answer is you have to decide the evidence as it was presented to you and you're not entitled to any additional information."

The jury's question makes it clear that the jury was attempting to follow the trial court's earlier admonition—and also makes it clear that, unlike the trial court's belief, the jury *had* noticed the other references. This only further emphasizes that the trial court should have replayed the objected to portions of the video if it had not "noticed" them. Its ruling denying the motion and taking no further action such as a second admonition only furthered the jury's confusion as to what evidence it should consider and what it should ignore.

The trial court gave its answer in open court, thus, it did not run afoul of Kentucky Rules of Criminal Procedure 9.74, which reads, "[n]o information requested by the jury or any juror after the jury has retired for deliberation shall be given except in open court in the presence of the defendant . . . and the entire jury, and in the presence of or after reasonable notice to counsel for the parties." Furthermore, the trial court did not violate "the general rule that new evidence will not be admitted after the case has been submitted to the jury." *Malone v. Commonwealth*, 364 S.W.3d 121, 133 (Ky. 2012) (citing *Stokes*

13

*v. Commonwealth,* 275 S.W.3d 185 (Ky.2008) (recognizing an exception to the rule)). However, the trial court's answer is incomprehensible—and we caution the bench about providing such answers. The trial judge giveth with one hand, and with the other taketh away: first telling the jurors that they could not consider the evidence of the prior stabbing; then, telling them to "decide the evidence as it was presented." The evidence as it was presented to the jury contained numerous improper references to the prior stabbing—which the trial court instructed the jury to consider in its deliberations (once those deliberations were already underway).

In summary, the Commonwealth first brought evidence of Roberts's prior assault before the jury in violation of the trial court's (albeit erroneous) order requiring it lay a foundation before presenting such in its case-in-chief. However, it provided an admonition which cured this error. Then, when the Commonwealth played several other portions of the interview which referenced the past assault, defense counsel objected. The trial court stated that it had not noticed the references, and, since he had not, it was unlikely the jury had either. Rather than reviewing the video to consider the basis of the objection—which he admitted he had not noticed—he ruled with no consideration of the facts, overruling the defense objection. Then, when several more references came in later through the interview recording, the trial court overruled the mistrial motion, claiming the references were vague. Finally, the obviously (and understandably) confused jury asked the trial court whether it could use the portions of the interview referencing Roberts's prior assault which were not

14

muted in its deliberations. This made it clear that the jury *had* picked up on those references—even if the trial judge had not. The judge then provided the jury with a meaningless answer: first telling the jury to disregard the evidence, and then instructing them to consider it. We must now determine if the facts of this case rise to the high level of reaching a manifest necessity for the granting of a mistrial.

### 3. *Manifest Necessity*

First, we recognize that "[i]t is well established that the decision to grant a mistrial is within the trial court's discretion, and such a ruling will not be disturbed absent a showing of an abuse of that discretion." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (2004). We have held "mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings and there is a 'manifest necessity for such an action.'" *Id* at 68 (quoting *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (2002)). Further, "a finding of manifest necessity is a matter left to the sound discretion of the trial court." *Commonwealth v. Scott*, 12 S.W.3d 682, 684 (Ky. 2000).

Moreover, this Court is mindful that

[i]n reviewing a decision to grant a mistrial, the trial court must have a measure of discretion. "The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that at any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred."

*Grimes v. McAnulty*, 957 S.W.2d 223, 225 (Ky. 1997) (quoting *Arizona v. Washington*, 434 U.S. 497, 513 (1978)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or

15

unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (2000) (citing *Commonwealth v. English*, 993 S.W. 2d 941, 945 (1999)).

With those standards in mind, we turn to the case at bar. The first miscue arose near the end of the first day of trial. The trial court resolved the problem with an admonition.

> It is normally presumed that a jury will follow an instruction to disregard inadmissible evidence that is inadvertently presented to it, unless (1) there is an overwhelming probability that the jury will be unable to follow the court's admonition; and (2) a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant. *Greer v. Miller*, 483 U.S. 756, 766, n. 8, 107 S. Ct. 3102, 3109, n. 8, 97 L.Ed.2d 618 (1987).

*Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky. 1993), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky. 1997). Here, there was neither an "overwhelming probability the jury [was] unable to follow the court's admonition" nor "a strong likelihood the effect of the inadmissible evidence" was devastating to Roberts after one brief mention.

As this Court has noted, we do not expect a jury to erase from their minds what they have heard; and we do not expect testimony or evidence to be "unheard." *Bartley v. Commonwealth*, 400 S.W.3d 714, 736 (Ky. 2013). However, we *do* expect that instructions from the trial court will make clear what jurors are to disregard and what they are not allowed to consider.

However, when the jury sent out a question during deliberations about how it was to treat the evidence it had seen and heard—but had been told to disregard some parts but not others, the jury indicated confusion over what it

16

was supposed to do with the improper admissions. The trial court's confusing instruction in answer to that question failed to cure the problem. The *overwhelming* probability the jury could not follow the instruction is inescapable, as the trial court's response was, itself, contradictory.

Defense counsel's second motion for mistrial further highlights the problems at trial. When the officer on the recording indicated that Roberts's weapon of choice was a steak knife, no immediate objection was raised. Several minutes later (and after additional statements regarding the prior assault came in), Roberts's counsel made this second motion for mistrial. The trial court remarked that he missed the reference and the jury had likely done the same. This was an unacceptable response by the trial court, as noted above. The trial court failed to review the evidence the jury had heard and properly address the motion for a mistrial.

When defense counsel raised its final motion for mistrial, the trial court denied it, finding that the mention of the prior bad act was "vague." Though the trial court offered another admonition, Roberts did not seek one. Given the numerous references to Roberts's inadmissible prior bad act, it was likely defense counsel sought to minimize further attention to the subject.

When viewed collectively, the multiple references to details of the 2003 assault and of Roberts being in trouble before created a manifest necessity for the trial court to grant her motion for mistrial, as she was denied a fair trial. It is important to note that, contrary to the trial court's ruling on the 404(b) evidence, it could not have been properly admitted even had the

17

Commonwealth laid a foundation. The trial court abused its discretion in failing to grant a mistrial.

We look for guidance to a recent opinion of this Court outlining the myriad of issues involved in a mistrial motion and appellate review of that decision. There, this Court stated:

> A mistrial is reserved for unique circumstances in which the prejudice is so great that a trial cannot continue fairly for both parties. "[T]he power to grant a mistrial ought to be used sparingly and only with the utmost caution, under urgent circumstances, and for very plain and obvious causes." *Cardine v. Commonwealth*, 283 S.W.3d 641, 647 (Ky. 2009) (quoting *Commonwealth v. Scott*, 12 S.W.3d 682, 685 (Ky. 2000) (citing *Glover v. McMackin*, 950 F.2d 1236, 1240 (6th Cir. 1991))).

*Commonwealth v. Padgett*, 563 S.W.3d 639, 646 (Ky. 2018).

In this case, the prejudice to Roberts by the introduction of inadmissible evidence time and again was so great that she could not receive a fair trial. In reaching this conclusion, we reaffirm this Court's prior holdings that the trial court should be granted considerable leeway in ruling on mistrial motions. "However, our stance on review does not require this Court to blindly adhere to a decision made in a trial court's discretion when such a decision was unsound." *Id.* at 647.

Herein, the jury heard inadmissible evidence of Roberts's prior assault numerous times. The first time, the trial court stopped the playing of the interview and admonished the jury. Had this been the sole reference to the prior bad act, the admonition would have cured the error. However, the very next day, the jury heard numerous references to Roberts stabbing another boyfriend with a steak knife in the past. In one of her motions for a mistrial,

18

the trial court denied her motion without reviewing the recording, even though it admitted it did not notice the references (and announced his belief that if he did not notice the references, the jury likely did not either). Then, the court compounded its error when the jury sought guidance as to what evidence it could consider in its deliberations. After reviewing the trial record, replete with references to Roberts's prior assault, we hold Roberts was denied a fair trial. Therefore, the trial court abused its discretion. These multiple errors, one added to the next, created just the sort of manifest necessity our precedent envisions for the extreme remedy of a mistrial.

For the above-stated reasons, we hold the trial court abused its discretion in denying Roberts's motion for mistrial. We address the remaining issues insofar as they are likely to recur on remand.

## B. Instructions for Self-Defense and Imperfect Self- Defense

It is well established in this Commonwealth that a trial court has a duty to instruct based on the facts in evidence before it. We have stated the applicable law on jury instructions many times and summarize it as follows:

> In a criminal trial, the trial court is obligated to instruct the jury on the "whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth,* 995 S.W.2d 355, 360 (Ky. 1999) (citing RCr 9.54(1); *Kelly v. Commonwealth,* 267 S.W.2d 536, 539 (Ky. 1954)). This obligation extends to lesser-included offenses and affirmative defenses, but is dependent upon there being sufficient evidence to warrant the giving of an instruction. *Grimes v. McAnulty,* 957 S.W.2d 223, 226 (Ky. 1997). "We review a trial court's rulings regarding instructions for an abuse of discretion." *Ratliff v. Commonwealth,* 194 S.W.3d 258, 274 (Ky. 2006) (citing *Johnson v. Commonwealth,* 134 S.W.3d 563, 569-70 (Ky. 2004)).

19

*Turner v. Commonwealth*, 544 S.W.3d 610, 625 (Ky. 2018).

Because the evidence in the case on remand may well differ from that in the previous trial (for example, Roberts may choose to testify on remand and provide additional evidence necessitating an instruction), we will not examine whether the trial court will be obligated to instruct the jury as to either self-defense or imperfect self-defense.

### C. Domestic Violence Exemption

After her conviction in the underlying trial, Roberts sought application of the domestic violence exemption for parole eligibility pursuant to KRS 403.720. The trial court held a hearing on the motion. Relying on testimony presented at that hearing, testimony and evidence from the trial, and evidence from the court's pretrial handling of the motion to admit Roberts's prior stabbing, the trial court ruled as follows: "The Court does not find the required nexus between the domestic abuse perpetrated by the victim upon the defendant, and the murder of the victim." Because this issue is likely to recur on remand assuming Roberts is again convicted, we address it.

A trial court's ruling on the applicability of the domestic violence exemption must be made under a preponderance of the evidence standard set out in KRS 403.740, and appellate review is conducted under a "clearly erroneous" standard. *Commonwealth v. Anderson*, 934 S.W.2d 276 (Ky. 1996). The trier of fact is permitted to believe the evidence of one litigant over another and may consider all circumstances including the credibility of witnesses. *Id.* at 278. As we set out in *Anderson*, the evidence must be such that the trier of

fact believes more likely than not the accused was a victim of domestic violence. *Id.* at 278.

We begin with the relevant statutory language. The applicable portions of KRS 403.740 are subsection (1) defining domestic violence and abuse and subsection (5) defining an unmarried couple. The definition of domestic violence and abuse includes physical injury and serious physical injury between members of an unmarried couple. Subsection (5) defines an unmarried couple to include people living together.

KRS 439.3401 defines and determines application of violent offender parole eligibility to certain offenses and includes an exception in subsection (5) for a person determined to have been a victim of domestic violence or abuse "in regard to" offenses involving the death of a victim. If found to qualify for the exemption, the accused shall not have the higher parole eligibility provisions set out in the violent offender statute apply to their sentence. Roberts's parole eligibility for murder would change from 85% to 20%, if the exemption were applicable.

We will examine the evidence presented concerning domestic violence both at trial and at the post-trial hearing on the applicability of the domestic violence exemption. While Roberts did not testify at trial, she did testify at the hearing on the exemption. There, she stated that Pinion struck her with the folding knife. The blow was hard enough to permanently damage her hearing in one ear. At trial, the only evidence of Roberts being hit with the folding knife came from one of Roberts's statements to the police. In that statement after

21

saying she was hit with the folding knife, Roberts clarified *when* she was hit with the knife—saying it had occurred earlier.

At trial, Amy and David Hogg testified that Roberts and Pinion lived together for several months prior to his death. At one point during this time, Roberts and Pinion separated. When they resumed living together, things between them were problematic. According to David and Amy, after Roberts and Pinion resumed living together, the couples no longer socialized with one another. Roberts and Pinion stayed in their bedroom, even taking their meals there.

Amy described bruises on Roberts and seeing her with a black eye. Pinion also had bruises on his arms according to Amy. Roberts and Pinion were daily drug users, and both were extremely jealous of one other. According to Amy, whenever Roberts left the trailer, Pinion checked her panties before she left and again when she returned. Roberts's recorded statements to police included her saying she was hit, slapped, and otherwise abused by Pinion.

The witness accounts about the night of the stabbing began with Amy and Roberts's trip to the Dollar Store. When they went, Roberts did not have Pinion's permission to go and problems began immediately. Amy testified she had to loan Roberts money because Roberts said Pinion had her money. Pinion sent Roberts a text message while they were at the store that read, "[y]ou best come home now, girlfriend." After returning from the Dollar Store, Amy said she heard an argument in the bedroom and "licks being passed" but Amy did not know who was being hit. After the argument and slapping sounds stopped,

22

Amy said Roberts came out of the bedroom and told her Pinion had her medicine and would not give it back. Amy did not know what David was doing when she spoke with Roberts and David did not testify that he witnessed this conversation.

David testified that after the Dollar Store trip, he heard an argument but no hitting. David went in the bedroom shared by Roberts and Pinion, and Roberts said Pinion had her money and would not give it back. After David told Pinion to return the money, Pinion threw three twenty-dollar bills on the bed. David left the bedroom and minutes later he heard Roberts yell "help." David and Amy testified they saw Pinion in the hallway bleeding and slumping to the floor. At the post-trial hearing, Roberts testified that she was hit immediately before the stabbing and had to defend herself.

Amy Hogg's and David Hogg's trial testimony and Roberts's recorded statements to police did not explain what happened in the bedroom between Pinion and Roberts in the critical moments before the stabbing.

At the post-trial hearing, in addition to Roberts, the trial court heard from Roberts's sister Misty Toomes, and her daughter Brittany Roberts. Misty and Brittany described what they saw during the time Roberts and Pinion lived together. They saw bruising on Roberts's arms and thighs, as well as a black eye, possibly on more than one occasion. Roberts described thirty episodes of assault by Pinion during the relationship. Reviewing the evidence before the trial court, the domestic relationship between Roberts and Pinion can be

described as toxic and physically abusive. The evidence clearly showed domestic violence and abuse between an unmarried couple living together.

Roberts testified at the post-trial hearing that Pinion struck the side of her head with a large folding knife that he kept in a holster on his belt. According to Roberts, the blow burst her eardrum and the injury left her unable to hear well out of that ear. The knife was found out of its holster next to Pinion's body in the hallway.

The police theory about why Pinion was stabbed changed when three blood soaked twenty-dollar bills were retrieved from Roberts's shoes in her personal property at the jail. The bills were found in the soles of the shoes Roberts was wearing the night of the stabbing. The police no longer theorized the stabbing was in self-defense because of domestic violence but was a result of a fight over money. The trial court found in its written order that the fight and stabbing arose over money and were not a product of domestic violence. However, based on the evidence, Pinion's control of Roberts's money was an element of the domestic violence in and of itself. Based on a review of the evidence the trial court had before it, findings that separated Pinion's control of Roberts's money from the pattern of domestic violence were erroneous.

The trial court noted in its order that it did not find the required nexus between the stabbing and domestic violence. As we made clear in *Gaines v. Commonwealth*, 439 S.W.3d 160, 164 (Ky. 2014), there must be a sufficient connection to comply with the "in regard to" language of KRS 439.3401(5).

> With regard to the second prong of the test—whether domestic violence or abuse endured by a defendant occurred "with regard to

24

> the offenses" committed by that defendant—we have construed the statutory text to mean that the domestic violence exemption of KRS 439.3401(5) applies only when the domestic violence or abuse was "*involved*" in the offense committed by the violent offender. *See Springer v. Commonwealth*, 998 S.W.2d 439, 457 (Ky. 1999). In *Commonwealth v. Vincent*, 70 S.W.3d 422 (Ky. 2002), we further explained the evidence must establish "some connection or relationship between the domestic violence suffered by the defendant and the underlying offense committed by the defendant." *Id.* at 424.

*Gaines*, 439 S.W.3d at 165.

While there was ample testimony concerning a history of domestic violence during the relationship between Roberts and Pinion, that is not enough to qualify for the exemption. As we further said in *Gaines*, "a prior history of domestic violence between a violent crime victim and the criminal defendant who perpetrated the violent offense does not, in and of itself, make the defendant eligible for the parole exemption of KRS 439.3401(5)." *Id.* at 165 (internal citations omitted). "Thus, the statute requires that there be a relationship between the domestic violence or abuse and the underlying offense. Proof of history of domestic violence between the defendant and the victim is not, by itself, sufficient to trigger the statute's parole exemption." *Vincent*, 70 S.W.3d at 424.

The evidence of domestic violence the night Pinion was stabbed was abundant and compelling. The key indicators of domestic violence present that night were control, threats of violence, and actual violence. A review of the evidence from the night of the stabbing is fundamental.

We begin with Amy's testimony that she and Roberts went to the Dollar store where Amy had to loan Roberts money because Pinion had taken her

25

money.  Roberts was required to obtain Pinion's permission to leave the trailer and, on this night, she did not have that permission.  As a result, Roberts received a text message that told her she better come home then—a message clearly carrying a threat of consequences if she did not comply.  Usually when Roberts went anywhere, Pinion checked her panties before she left and when she returned.  That did not happen on this night because Roberts did not seek permission to go to the store.

Once Roberts returned, Amy heard blows being swapped in the bedroom Roberts and Pinion shared.  At some point, Roberts spoke to Amy in the kitchen and said Pinion had her medicine and would not give it back.  David said he heard an argument, went in the bedroom and told Pinion to return Roberts's money and he tossed it on the bed.  Moments later, Pinion was stabbed.  The trial court found that the stabbing was related to the money, not to domestic violence.  However, this finding does not make sense.  At the time Roberts stabbed Pinion, he had already returned her money.  As previously discussed, Pinion taking Roberts's money was, itself, an act of domestic violence—it was a means through which he exacted control.  If Pinion were trying to take Roberts's money from her again when she stabbed him, this would have been a further act of domestic violence—and could have potentially amounted to robbery.  The trial court's ruling that the dispute over money was not domestic violence was erroneous.  We address it as it may recur on remand.

Roberts correctly points out that there is no requirement that the offense and domestic violence occur simultaneously. As the Court of Appeals has said: "We believe that the statutes require a lesser showing of connection than proof that appellant was undergoing physical abuse at that time. The trial court should look at the totality of the evidence to determine if some connection was shown." *Holland v. Commonwealth*, 192 S.W.3d 433, 439 (Ky. App. 2005).

Guidance in understanding domestic violence can be found on the Ky.gov website, the official website of the Commonwealth of Kentucky. CHFS, the Kentucky Cabinet for Health and Family Services posts numerous informational resources there to assist victims of domestic violence. Included in the resources is The Clark County Indiana Prosecutor's Office page "Domestic Violence," which contains useful information about recognizing domestic violence. The first paragraph makes clear that domestic violence includes not only physical harm or sexual assault, but also "fear of physical harm." The site indicated: "The batterer uses acts of violence and a series of behaviors, including intimidation, threats, psychological abuse, and isolation to coerce and control the other person." These acts subject the other person to intense and repetitive degradation to gain power and control over that person.

The webpage lists numerous examples of abuse and we point to relevant ones present in this case including the following: slapping; hitting; using weapons; making her ask for money; taking her money; making or carrying out threats to hurt her; controlling what she does, who she sees, and where she

goes; not allowing her to freely use the car; and checking up on where she's been or who she's talked to.

The above list is reflected in the evidence surrounding the evening Pinion died, beginning with Robert's trip to the store without Pinion's permission and ending with his stabbing. The illustrative items on this list found in this case, met the requirements in the exemption statute for a required connection between the violent act and the domestic violence. The trial court in this case did look at the totality of the circumstances including the history of domestic violence in the relationship between Roberts and Pinion, Roberts's prior history of violence involving live-in boyfriends, rampant drug use by the trailer inhabitants, Roberts's and Pinion's jealousy toward each other, Amy Hogg's and David Hogg's testimony, and physical evidence from the crime scene. Upon review of the record, we hold the trial court was clearly erroneous in its finding that Roberts did not meet her burden that Roberts's actions in stabbing Pinion were "in regard to" domestic violence. As noted, Pinion taking Roberts's money was an act of domestic violence in the context of the extensive evidence about the couple's relationship.

Therefore, the trial court's finding that the dispute being over money somehow excluded it from also being an act of domestic violence was erroneous. On remand, it should be mindful of the principles set forth above.

### D. Cumulative Error

Having already found reversible error, we need not address Roberts's cumulative error claim.

28

## III. CONCLUSION

For the foregoing reasons, we reverse Roberts's conviction, vacate her corresponding sentence, and remand for further proceedings consistent with this opinion.

Minton, C.J.; Hughes, Keller, Lambert, and VanMeter, JJ., concur. Nickell, J., concurs in result only.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Joseph A. Newberg II
Assistant Attorney General